**In the Matter of NIKRON, INC., a Michigan corporation, Debtor.**

**Bankruptcy No. 82–04159–B.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Feb. 22, 1983.

Goldstein, Goldstein & Bershad, P.C. by Paul H. Steinberg, Southfield, Mich., for debtor.

OPINION

GEORGE BRODY, Bankruptcy Judge.

This case raises questions of paramount importance in the administration of chapter 11 cases—namely, whether a bankruptcy judge on his own motion has sua sponte power to convert a chapter 11 case to a chapter 7 case and what limits there are, if any, as to the availability of chapter 11 as a vehicle for liquidation.

Nikron, Inc., owned and operated a theater. In December of 1981, it sold the theater for $131,000. After deducting taxes, commissions, and closing costs, the net amount due the debtor was $98,500, which was to be paid by the purchaser at the rate of $1,700 a month. Each monthly payment made by the purchaser was turned over to the Internal Revenue Service in partial satisfaction of a tax indebtedness of $25,000, less approximately $300 deducted by the sole stockholder for services rendered in connection with the collection and distribution of such payment. On July 21, 1982, Nikron, Inc., filed this chapter 11 proceeding allegedly to stay a threatened seizure by the IRS of the account receivable to satisfy the tax indebtedness. At the time of the filing of the petition, the only asset of the debtor was the account receivable, now reduced to $91,914.97. The debtor proposes to file a plan which will provide for the continued collection of the account and payment of monthly compensation to the sole stockholder, the distribution of the proceeds collected to the IRS, and after satisfaction of the IRS indebtedness, payment to other creditors of the debtor.[1] There has been no creditor participation in the case. An unsecured creditors' committee provided for by section 1102(a)(1) was not appointed, since there were no creditors who evidenced a willingness to serve. § 1102(b)(1).

The court, based upon these disclosed facts, issued an order to show cause why the case should not be converted to chapter 7 on the ground that the case and the plan were not filed in good faith.

1. The schedules reveal that the debtor has unsecured debts in the amount of $50,321.63.

In opposing the court's sua sponte action, the debtor contends that section 1112(b)(2) confers power upon the court to convert a chapter 11 case to a case under chapter 7 only "on request of a party in interest." Since no "party in interest" has requested the court to convert, the court is without power to do so sua sponte. 5 *Collier on Bankr.* § 1112.01 at 1112–3 to –4 (15th ed. 1982) [hereinafter cited as *Collier*]; *In re Gurwitch,* 6 Bankr.Ct.Dec. (CRR) 264 (Bankr.S.D.Fla.1980).

Some background is necessary to place the problem posed in proper perspective. In 1970, Congress established a Commission on the Bankruptcy Laws of the United States to study, analyze, evaluate, and recommend changes in the Bankruptcy Act. Act of July 24, 1970, Pub.L. No. 91–354, 84 Stat. 468. The Commission filed its report on July 30, 1973. H.R.Doc. No. 137, 93d Cong., 1st Sess. (1973) [hereinafter cited as H.R.Doc. No. 137]. The report contained two parts. Part I was a recitation of the Commission's findings. Part II contained a draft of proposed legislation to implement the Commission's recommendations. In the report, the Commission concluded that participation by bankruptcy judges in the administrative aspects of bankruptcy proceedings tended to impair the confidence of litigants in the impartiality of the judges' decisions. *Id.* at Pt. I, 93–94. To restore the confidence of litigants in the integrity of bankruptcy administration, the Commission recommended that the bankruptcy judges perform only judicial functions and that a separate agency be established in the executive branch to perform case administrative functions. *Id.* at Pt. I, 94. The bankruptcy judges would then be able to devote their time solely to the determination of disputes and to decide them untainted by knowledge of matters unnecessary to judicial determinations. *Id.*

The Commission bill was introduced in both Houses in 1973, as S. 2565, 93d Cong., 1st Sess. (1973) and H.R. 10792, 93d Cong., 1st Sess. (1973), but Congress did not act on the proposed legislation during that session. In 1974, the Commission bill was reintroduced as H.R. 31, 94th Cong., 1st Sess. (1975) and S. 236, 94th Cong., 1st Sess. (1974). 1 *Collier* ¶ 1.03; W. Norton, *Bankruptcy Law and Practice* § 2.03 (1982). The National Conference of Bankruptcy Judges drafted a competing proposal, which was also introduced in both Houses. S. 235, 94th Cong., 1st Sess. (1974); H.R. 32, 94th Cong., 1st Sess. (1975). Extensive hearings were held on these bills in both the House and the Senate. Two new proposals emerged, H.R. 6, 95th Cong., 1st Sess. (1977) and S. 2266, 95th Cong., 1st Sess. (1977). Klee, *Legislative History of the Bankruptcy Reform Act of 1978* in *Annual Survey of Bankruptcy Law* (1979).

In February of 1978, the House of Representatives passed H.R. 8200, which had evolved from the prior drafts that the House had considered. The Senate enacted its version of H.R. 8200 in September of 1978. H.R. 8200, as adopted by the Senate, retained the enacting clause of H.R. 8200 but substituted the text of S. 2266 for the provisions contained in H.R. 8200. The House version of H.R. 8200 accepted the Commission's recommendation "that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the performance of essentially judicial functions, that is, primarily to the resolution of disputes involving adversary parties and matters appropriate for judicial determination." H.R.Doc. No. 137 at Pt. I, 94. Section 1112(b) of the House version of H.R. 8200 reflected this approach by providing that a court could convert "on request of a party in interest" and made no reference to a conversion by a court sua sponte. However, the House recognized that there is a public interest in the proper administration of bankruptcy cases. "Bankruptcy is an area where there exists a significant potential for fraud, for self-dealing, and for diversion of funds. In contrast to general civil litigation, where cases affect only two or a few parties at most, bankruptcy cases may affect hundreds of scattered and ill-represented creditors." H.R.Rep. No. 595, 95th Cong., 1st Sess. 88 (1977) *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6050 [hereinafter cited as H.R.Rep.

No. 595]. Creditors, except in large cases where substantial creditor investment justifies continuing creditor involvement, rarely participate in case administration. "[G]enerally the activity of the parties in interest is directly related to the size of a debtor's estate." *In re Coram*, 11 B.R. 641, 644 (Bkrtcy.E.D.N.Y.1981). Creditors rarely serve on creditors' committees designed to protect their interests. Moreover, in too many cases where creditors' committees are formed, the creditors' committees exist in name only and are completely ineffectual.[2] "In general civil litigation, a default by one party is relatively insignificant, and though judges do attempt to protect parties' rights, they need not be active participants in the case for the protection of the public interest in seeing disputes fairly resolved. In bankruptcy cases, however, active supervision is essential. Bankruptcy affects too many people to allow it to proceed untended by an impartial supervisor." H.R.Rep. No. 595, at 88, U.S.Code Cong. & Admin.News 1978, 6050. For these reasons, the drafters of the House bill recognized that if judges were to be removed from the administrative process, provisions had to be made for an impartial substitute to monitor cases to insure effective case administration and to preserve the integrity of the bankruptcy system. Accordingly, the House bill provided for the creation of the Office of the United States Trustee to

> relieve the bankruptcy judges of their current administrative and supervisory role, and [to] become the principal administrative officers of the bankruptcy system. Bankruptcy judges, relieved of administrative responsibilities, will take a more passive role, consistent with their judicial responsibilities, which will serve to eliminate the institutional bias that exists in the bankruptcy system today.

*Id.* at 101, U.S.Code Cong. & Admin.News 1978, 6063.[3] The Senate's bill contained a markedly different approach to case supervision. It saw no need for the creation of the Office of the United States Trustee. Such an Office would merely, in its view, create a costly and unnecessary bureaucracy. 124 Cong.Rec. S17406 (daily ed. Oct. 6, 1978) (remarks of Sen. Wallop). Under the Senate version of H.R. 8200, the bankruptcy judge would continue to perform both administrative and judicial functions. Accordingly, its version of section 1112(b) expressly conferred power upon the bankruptcy court to convert a chapter 11 case to chapter 7 or dismiss a chapter 11 case "on its own motion." S. 2266. The House and Senate bills had other significant differences. Extensive changes were made to reconcile the differences between the Senate and House versions of H.R. 8200 and are documented in the September 28th and October 6th daily edition of the Congressional Record. 124 Cong.Rec. H11047–117 (daily ed. Sept. 28, 1978); 124 Cong.Rec. H11864–66 (daily ed. Oct. 6, 1978); 124 Cong.Rec. S17403–34 (daily ed. Oct. 6, 1978). The differences relating to the issues that impact upon this controversy were resolved as follows. The House version of 1112(b) was adopted. The Senate reference to the court's power to act "on its own motion" was deleted. The Office of the United States Trustee was established as a pilot program in eighteen of the seventy-seven judicial districts. 28 U.S.C. § 581(a). A United States Trustee was not authorized for this judicial district nor for any judicial district in the Sixth Circuit.

 Section 1112(b) is not to be read in a vacuum. Any construction of section 1112(b) cannot ignore the legislative background that led to its enactment. "[T]o follow blindly the plain meaning of a statute without regard to the obvious intention of Congress would create an absurd result in accord with neither established principles

---

**2.** In 1982, 299 chapter 11 cases were filed in the Eastern District of Michigan, Southern Division. Creditors' committees were appointed in only 147 cases. Creditors refused to serve in the remaining cases. Moreover, even where creditors' committees are appointed, their ef-

fectiveness in the vast majority of cases is questionable.

**3.** Section 581 of H.R. 8200 provided for the appointment by the Attorney General of United States Trustees for each judicial district. H.R. 8200, 95th Cong., 1st Sess. § 581 (1977).

of statutory construction nor common sense." *In re Adamo,* 619 F.2d 216, 219 (2d Cir.1980). Both the House and Senate recognized that "bankruptcy affects too many people to allow it to proceed untended by an impartial supervisor" whether by a bankruptcy judge, the United States Trustee or some other entity. It is reasonable to conclude that Congress did not intend to place the bankruptcy judge "on a pedestal watching the estates under his jurisdiction ... dissipate themselves through lack of supervision."[4] Congress did not intend, at least in non-pilot districts, that bankruptcy judges sit idly by and blithely ignore abuses that could lead to the compromise of the bankruptcy system and the integrity of the court. A court has the inherent power and duty to control its docket, to preserve its integrity, and to insure that the legislation administered by the court will accomplish the legislative purpose. *In re Coram.* A statute is not to be applied "strictly in accord with its literal meaning where to do so would pervert its manifest purpose." *In re Adamo,* 619 F.2d at 222. Based upon the foregoing reasons, it is the holding of this court that a court has the sua sponte power to convert or dismiss a chapter 11 case.

Not only must the court consider the legislative intent and purpose of a statute, but a court is not to construe any statutory provision in isolation apart from other related provisions. "It is not to be presumed that Congress intended any part of a statute to be without reasonable meaning." *Payne v. Panama Canal Co.,* 607 F.2d 155, 164 (5th Cir.1979). It is the duty of a court, therefore, "to give effect, if possible, to every clause and word of a statute." *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 394–95, 27 L.Ed. 431 (1882). Inferences permissibly drawn from other related and relevant Code provisions buttress the conclusion that the court has sua sponte power to convert or dismiss a chapter 11 case.

Section 1108 provides that "[u]nless the court orders otherwise, the trustee may operate the debtor's business." The power to terminate the operation of a business is unconditionally conferred upon a court. Section 1108 does not limit the exercise of this power to cases in which a termination request is made by "a party in interest." If the operation of a business is terminated based upon a finding of "continuing loss to or dimunition of the estate and the absence of a reasonable likelihood of rehabilitation," a finding which is the basis for conversion by virtue of section 1112(b)(1), can the court's power to convert be reasonably questioned? To deny power to the court to convert on its own motion under such circumstances would compel a court to retain a case on its docket for no apparent purpose. Such a result clearly could not have been intended.

The power of the court to convert or dismiss a chapter 11 case on its own motion may also be inferred from the power expressly granted to the court by section 1129(a). Section 1129(a) provides that the court shall confirm a plan only if certain requirements are met.[5] Section 1129(a) requires the court to independently determine whether the requirements are met even in the absence of any objections. *In re Economy Cast Stone Co.,* 16 B.R. 647 (Bkrtcy.E.D. Va.1981). If the court determines that a plan does not satisfy the requirements set forth in section 1129 as a condition of confirmation, and if the court further finds that the debtor does not have the ability to effectuate a plan, it must follow that a court has the power to either convert or dismiss the case pursuant to section

---

**4.** This statement appears in a letter written to the author of this opinion by Senator DeConcini. The letter is reprinted in full as Exhibit I.

**5.** Three of section 1129(a)'s requirements are:

(1) The plan complies with the applicable provisions of this chapter.

(2) The proponent of the plan complies with the applicable provisions of this chapter.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

. . . .

11 U.S.C. § 1129(a)(1), (2), (3).

1112(b)(2). Any other conclusion, again, is clearly untenable.[6]

■ Since the court has the power to convert a chapter 11 case on its own motion, it is necessary to consider whether grounds for conversion exist. A plan, to be confirmed, must be proposed in good faith. § 1129(a)(3). A plan is proposed in good faith "when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Nite Lite Inns,* 17 B.R. 367, 370 (Bkrtcy.S.D.Cal.1982). If a plan is not proposed in good faith, the plan cannot be confirmed. Inability of a debtor to obtain confirmation of a proposed plan is grounds for conversion. § 1112(b)(5). The simple question, therefore, is whether the debtor's proposed plan is a plan that is capable of confirmation. The debtor contends that he has proposed a plan of liquidation, section 1123(b)(4) authorizes such a plan, and, therefore, the plan must be confirmed.

Section 1123(b)(4) provides that "a plan may . . . provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." Section 1123(b)(4) is supplemented by section 1123(a)(5)(D), which allows the debtor to sell all or any part of its property as a means of executing a plan. 5 *Collier* ¶ 1123.02. Section 1123(a)(5)(D) and (b)(4) are derived from section 216(10) of chapter X, which provided that "[a] plan of reorganization . . . shall provide adequate means for the execution of the plan . . . which may include: . . . the sale of all or any part

of [the debtor's] property." The cases construing section 216(10), therefore, are equally applicable under chapter 11 of the Code. *See* H.R.Rep. No. 595, at 407. While a corporation could liquidate in chapter X, the primary purpose of chapter X was to promote reorganization. Chapter X, therefore, was not to be "invoked where at the outset it is reasonably clear that the corporation [was] in such financial condition that it [had to be] liquidated." 6 *Collier* ¶ 0.09 at 99. However, "if the prospects for rehabilitation were reasonable at the time that the chapter X was initiated, a plan for reorganization may provide for liquidation where rehabilitation has since proved futile." *Id.* at 99–100; *Fidelity Assurance Association v. Sims,* 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032 (1942). Chapter 11 retains chapter X's underlying purpose. H.R.Rep. No. 595, at 220.

■ The debtor sold all of its assets prior to the filing of the chapter 11. At the time of the filing, the debtor had no business to reorganize and, in fact, had no intention to reorganize. The chapter 11 was allegedly filed to prevent the IRS from seizing the account receivable. However, the principal purpose for the filing was to ensure an income to the sole stockholder of the debtor for the life of the account.[7] If the IRS had not threatened to seize the account, the chapter 11 would not have been filed.[8] The case was not filed to accomplish any purpose or objective of chapter 11. Congress did not intend that chapter 11 be used as a substitute for chapter 7. Chapter 11 is not a device to be employed to

---

6. The court's power to convert sua sponte, inferable from sections 1108 and 1129(a), would seem to exist regardless whether the case arises in a pilot or a non-pilot district. However, in a pilot district this power should be used sparingly.

7. The sole stockholder, if he continued to pay himself $300 a month for collecting the account and distributing the proceeds, would receive approximately $18,000 over the life of the account. The maximum allowable trustee fee for collecting the account and making the appropriate distribution cannot exceed $1,799.15. § 326(a).

8. Chapter 11 is not to be used as a means of preventing a creditor from enforcing its claim. *In re G–2 Realty Trust,* 6 B.R. 549 (Bkrtcy.D. Mass.1980); *First Inter-State Bank v. Weathersfield Farms (In re Weathersfield Farms),* 14 B.R. 574 (Bkrtcy.D.Vt.) *aff'd,* 15 B.R. 282 (D.C. D.Vt.1981). The filing of a chapter 7 would just as effectively have stayed the IRS from seizing the account. Section 362(a) is applicable in chapter 7 as well as in chapter 11. § 103(a).

provide an annuity for stockholders of the debtor or to generate fees for the debtor's counsel.[9]

Moreover, a plan of liquidation, where appropriate, contemplates the existence of property to be liquidated to effectuate the proposed plan. All of the debtor's property was sold prior to the filing of the chapter 11. Liquidation had been consummated prior to the filing. All that remained to be done was to collect an account generated by the liquidation. Clearly a chapter 11 cannot be used to accomplish what the debtor proposes.

The only question that remains is whether the case should be converted or dismissed. The facts clearly establish that the interests of creditors would best be served by conversion.

An order converting this chapter 11 case to a case under chapter 7 will be entered by the court.

## EXHIBIT I

STROM THURMOND. S C., CHAIRMAN

CHARLES McC. MATHIAS. JR., MD. JOSEPH R. BIDEN. JR., DEL.
PAUL LAXALT. NEV. EDWARD M. KENNEDY. MASS.
ORRIN G. HATCH. UTAH ROBERT C. BYRD. W. VA.
ROBERT DOLE. KANS. HOWARD M. METZENBAUM. OHIO
ALAN K SIMPSON. WYO. DENNIS DeCONCINI. ARIZ.
JOHN EAST. N.C. PATRICK J. LEAHY. VT.
CHARLES E. GRASSLEY. IOWA MAX BAUCUS. MONT.
JEREMIAH DENTON. ALA. HOWELL HEFLIN. ALA.
ARLEN SPECTER. PA.

EMORY SNEEDEN. CHIEF COUNSEL
QUENTIN CROMMELIN. JR., STAFF DIRECTOR

United States Senate

COMMITTEE ON THE JUDICIARY
WASHINGTON. D.C. 20510

April 3, 1981

Honorable George Brody
United States Bankruptcy Judge
Eastern District of Michigan
1055 United States Courthouse
Detroit, Michigan 48226

Dear Judge Brody:

Thank you for your recent letter commenting specifically on the U.S. Trustee program and the administration of bankruptcy cases. Your points are well made and echo other similar comments I have heard recently. Senator Bob Dole is the new chairman of the Subcommittee having bankruptcy jurisdiction and I have taken the liberty of forwarding a copy of your letter to him.

Possibly the answer to administrative problems is to expand the U.S. Trustee program, but as you know, they're currently fighting hard simply to retain the ten pilot programs. The other obvious answer lies in returning to the judges responsibility over those ministerial matters necessary to administer a case with at least a modicum of efficiency and respect for the right of the parties involved. Many commentators refer to the fact that the Code removed judges from all administrative matters and left them to act solely and purely in a 'judicial' manner. That is an overstatement. It was certainly the intent to remove the judge from the mundane matters of administration but we never intended to place him on a pedestal watching the estates under his jurisdiction-administration?-dissipate themselves through lack of supervision. There is a fine line that must be walked, but I am

9. On superficial examination, the retainer received by counsel appears to be excessive when compared to the compensation allowable in a routine chapter 7. The court has the power, which it will exercise pursuant to section 329, to re-examine the reasonability of any prepetition fee paid to counsel for the debtor.

concerned about reports that too many judges are, indeed, operating above the fray when their guidance could avoid many unnecessary delays and problems. I hasten to add that I feel most judges are responding to their new role in a fine fashion.

Thank you again for your thoughtful comments,

Sincerely,

DENNIS DeCONCINI
United States Senator