## In the Matter of GUSAM RESTAURANT CORPORATION, d/b/a Heads & Tails, Debtor.

### Bankruptcy No. 882–82093–17.

United States Bankruptcy Court, E.D. New York.

Aug. 30, 1983.

---

Holland & Zinker by Edward Zinker, Smithtown, N.Y., for debtor.

Rosemary Muratori, Estate Administrator, United States Bankruptcy Court E.D. N.Y., Westbury, N.Y.

## MEMORANDUM

BORIS RADOYEVICH, Bankruptcy Judge.

On August 17, 1982 Gusam Restaurant Corporation (hereinafter "Gusam") filed its petition under Chapter 11 of Title 11 of the United States Code. Upon application made April 24, 1983, by Rosemary Muratori, the Estate Administrator, this Court signed an order directing Gusam to show cause why its petition should not be dismissed or converted to a proceeding under Chapter 7 due to its failure to comply with the duties imposed upon it pursuant to 11 U.S.C. § 1106(a)(5). On May 24, 1983, the return date of the Order to Show Cause (hereinafter "OSC"), this Court was informed that a going concern sale of the debtor's business had been consummated and that a liquidation plan of arrangement was contemplated. Upon the debtor's representations that it would expeditiously move to file and confirm its Chapter 11 plan, this Court repeatedly adjourned the OSC until its fourth return date of August 11, 1983. As a result of the debtor's failure to satisfactorily justify its inactivity, this Court, in a decision rendered from the bench, ordered the debtor's petition converted, and appointed a Chapter 7 trustee to administer its estate. Gusam filed a notice of appeal August 18, 1983. This memorandum decision is submitted *post facto* in an effort to provide the appellate court with a more complete record of this Court's decisional basis.

Gusam's primary objection to the conversion involves the propriety of this Court's *sua sponte* issuance of the OSC which resulted in its conversion. It is argued that both the estate administrator and this Court lack the requisite standing to have initiated the involved conversion motion as neither are parties-in-interest as defined with 11 U.S.C. § 1112(b).

While it is recognized that a principal objective in enacting the Bankruptcy Reform Act of 1978 was "that the bankruptcy judges be removed from the administration of bankruptcy estates and be restricted to the performance of essentially

judicial functions," this Court can not concur with the debtor's conclusion that Congress intended to strip it of its traditional and inherent equitable authority to ensure the orderly administration of the debtor's estate and to monitor the interests of its creditors. *Banque de Financement v. First Nat. Bank of Boston,* 568 F.2d 911 (2d Cir. 1977); *In re Ettinger,* 76 F.2d 741 (2d Cir. 1935); *In re Coram Graphic Arts,* 7 B.C.D. 1014, 11 B.R. 641 (Bkrtcy.E.D.N.Y.1981); *In re Pioneer Warehouse Corp.,* 2 B.R. 1 (Bkrtcy.E.D.N.Y.1979). *See also* H.R.DOC. NO. 137, 93rd Cong., 1st Sess. at Pt. I, 94 (1973). As aptly noted in H.R.Rep. No. 595, 95th Cong., 1st Sess. 88 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 and cited to *In re Nikron, Inc.,* 27 B.R. 773 (Bkrtcy.E.D.Mich.1983):

> Bankruptcy is an area where there exists a significant potential for fraud, for self-dealing, and for diversion of funds. In contrast to general civil litigation, where cases affect only two or a few parties at most, bankruptcy cases may affect hundreds of scattered and ill-represented creditors....

>> In general civil litigation, .... judges ... need not be active participants in the case for the protection of the public interest... In bankruptcy cases, however, active supervision is essential.

It is clear that both houses of Congress recognized the problems associated with letting Chapter 11 debtors run their own show, subject only to creditor objection.[1] The Senate originally sought to retain a measure of accountability by expressly providing this Court with the authority to convert or dismiss on its own motion. *See In re Nikron, Inc.,* cite supra at 776; Sen.Rep. No. 95–989, 95th Cong., 2d Sess. at p. 117 (1978). The House preferred to vest the responsibility for supervising the Chapter 11 debtors within an entirely separate administrative entity, the Office of the United States Trustee. The legislative compromise which resulted in enactment of the Bankruptcy Reform Act of 1978 established a pilot United States Trustee program in eighteen of the seventy-seven judicial districts. To fill the administrative void created in the non-pilot districts, the Administrative Office of the United States Courts created the anomalous, slightly more Court controlled position of Estate Administrator.

The United States Trustee being a recognized party-in-interest for the purposes of § 1112(b), the question presented is, how did Congress intend for the non-pilot districts to police its Chapter 11 debtor's activities? *See In re Commercial Finance Corp. of Nevada,* 16 B.R. 98 (Bkrtcy.D.C.1981); *See also* Rules of Bankr.P. # X–1009(a). In seeking to construe the absence of express statutory authorization for this Court to *sua sponte* convert,

> Section 1112(b) is not to be read in a vacuum. Any construction of section 1112(b) cannot ignore the legislative background that led to its enactment. "[T]o follow blindly the plain meaning of a statute without regard to the obvious intention of Congress would create an absurd result in accord with neither established principles of statutory construction nor common sense." *In re Adamo,* 619 F.2d 216, 219 (2d Cir.1980). Both the House and Senate recognized that "bankruptcy affects too many people to allow it to proceed untended by an impartial supervisor" whether by a *bankruptcy judge,* the *United States Trustee or some other entity.* It is reasonable to conclude that Congress did not intend to place the bankruptcy judge "on a pedestal watching the estates under his jurisdiction ...

---

1. Reliance upon the Chapter 11 creditors committee to regulate the activities of the debtor is misplaced. It is generally understood that:

 > Creditors, except in large cases where substantial creditor investment justifies continuing creditor involvement, rarely participate in case administration. "[G]enerally the activity of the parties in interest is directly related to the size of a debtor's estate." *In re Cor-*

 *am,* 11 B.R. 641, 644 (Bankr.E.D.N.Y.1981). Creditors rarely serve on creditors' committees designed to protect their interests. Moreover, in too many cases where creditors' committees are formed, the creditors' committees exist in name only and are completely ineffectual.

 *See In re Nikron, Inc.,* 27 B.R. 773 (Bkrtcy.E.D. Mich.1983).

dissipate themselves through lack of supervision." Congress did not intend, at least in non-pilot districts, that bankruptcy judges sit idly by and blithely ignore abuses that could lead to the compromise of the bankruptcy system and the integrity of the court. A court has the inherent power and duty to control its docket, to preserve its integrity, and to insure that the legislation administered by the court will accomplish the legislative purpose. *In re Coram.* [*cite supra*] A statute is not to be applied "strictly in accord with its literal meaning where to do so would pervert its manifest purpose." *In re Adamo,* 619 F.2d at 222.

Emphasis added. *See In re Nikron, Inc., cite supra* at 777.

■ Surely Congress intended the import of the aforecited sentiment to apply uniformly to *all* its Bankruptcy Courts. It is therefore a logical conclusion that the decision not to extend the United States Trustee program to all the judicial districts does not demonstrate a legislative resolve to remove all supervisory responsibility from the remainder of the bankruptcy system. It can only be assumed that Congress intended, within non-pilot districts, to leave administrative responsibility with the bankruptcy judge.

This judicial construction finds ancillary support within 11 U.S.C. § 105 which postulates that, absent the Code's express prohibition, the bankruptcy court is vested with the powers traditionally exercised under the prior Bankruptcy Act, as well as the power to "issue any order, process, or judgment that is necessarily or appropriate to carry out the provisions of this title." *See* H.R. Rep. 95–595, 95th Cong., 1st Sess at pg. 317 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; *See also In re Larmar Estates, Inc.,* 5 B.R. 328, 6 B.C.D. 711 (Bankr.E.D.N.Y.1980); *In re Dutch Flat Investment Co.,* 6 B.R. 470, 6 B.C.D. 1134 (Bkrtcy.N.D.Cal. 1980). It is well recognized that the power to *sua sponte* dismiss is one such traditional § 105 power. *In re Coram Graphics, Inc., cite supra.* From that basis it takes only a small analytical step to conclude this Bank-

ruptcy Court must necessarily possess the additional inherent power to *sua sponte* convert. Without the power to convert, this Court would not be able to guarantee that the purposes of the Bankruptcy Code are fulfilled. The power to dismiss is often an inadequate remedy to rectify the injustices which result should a debtor abuse this Court's jurisdiction. The spirit of the Code certainly envisions providing this Court with more than the limited dismissal power of returning the parties to their prefiling status.

■ For the purposes of this decision, the issue of whether it is the Court or the estate administrator which is the proper party-in-interest need not be decided. In requesting the involved OSC, the estate administrator was acting pursuant to a general directive established by this Court. As the OSC was essentially a cooperative effort, either or both of the offices of the estate administrator or this Court must necessarily be the depository of the inherent authority to supervise the activities of the debtor. Accordingly, the propriety of this Court's *sua sponte* issuance of the OSC is sustained.

Having established its authority to entertain the § 1112(b) motion, the remaining question is whether this Court had sufficient justification to convert. In pertinent part, § 1112(b) provides:

> on request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—
>
> (1) continuing loss to or diminution of the estate and absence of a reasonable likelyhood of rehabilitation;
>
> (2) inability to effectuate a plan;
>
> (3) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (4) failure to propose a plan under section 1121 of this title with any time fixed by the court;

■ This Court finds ample justification for converting this debtor. Not only was Gusam unable or unwilling to effectuate a plan within the time frame set by this Court, but there also existed cause to suspect that the debtor had engaged in a course of conduct designed to dissipate its estate.

Gusam was put on notice, four months prior to its conversion, of this Court's displeasure with its progress in this case. Generally, eight months is more than enough time to work out the details of a simple restaurant reorganization. It was explained that no disclosure statement or plan had been filed as the debtor had chosen to self-liquidate and that they were waiting to close on the sale of Gusam's business which was scheduled for July 18, 1983. Though this Court was of the opinion that a plan could be proposed while waiting for the sale's finalization,[2] it granted the debtor what amounted to a four month adjournment. A month after the closing, on August 11, 1983, this debtor again sought to impose upon the patience of this Court by requesting yet another sixty days to submit its plan. Gusam's deliberate disregard of this Court's express directive to file a disclosure statement and plan on or before the August 11th date fixed by this Court constitutes cause as defined in § 1112(b)(4). Even in the absence of this Court's establishing a specific filing date, a full year delay in a case of this sort is sufficient cause to dismiss or convert pursuant to § 1112(b)(1), (2) & (3).

Sufficient cause being demonstrated, § 1112(b) required this Court to decide whether it would be in the best interest of this debtor to convert or dismiss. Dismissal of this case would not be in the best interest of the estate's creditors. They have been required to wait patiently pending the administration of this case for a full year. Such patience has as its consolation only the assurance that the debtor's assets will be divided fairly. The dismissal of this case at this late date would surely prejudice some of Gusam's creditors as it would result in a race to judgment and execution.

From the limited information available in the debtor's sketchy monthly reports, it is apparent that this debtor never made a bona fide effort to reorganize or to comply with the Rules of this Court. Repeated requests from the Estate Administrator for detail as to the debtor's disbursements was ignored. Disbursements for salary and automobile expense appeared to be excessive for the business conducted by the debtor.[3] Debtor's counsel at the hearing on August 11th, 1983, was unable to explain such disbursements or to even advise the Court as to the status of the debtor's bank account.

Though such behavior is permissible absent the creditors' objection, it signifies that the debtor was not being properly monitored[4] and that it was not generally acting in the best interest of its creditors. If in fact the debtor has gone so far as to perpetrate a fraud, without effective creditor participation, such conduct will not be disclosed. Under such circumstances this Court felt conversion and the appointment of a trustee was indicated.[5]

2. In fact, the debtor's circumstances are incredibly conducive to formulating a plan. As the entire estate would be comprised of the proceeds from the restaurant's sale, and as a price of $275,000.00 had already been established; there existed no room for further negotiation and no impediment to formulating a plan.

3. It was not until July 7, 1983, after this Court issued the involved OSC that the debtor complied with this Court's requirement that it submit monthly debtor-in-possession operating statements. Even then, it only supplied information through March of 1983. These reports, along with the testimony adduced at the August 11th hearing, indicated that in a half year period Gusman paid salaries of $64,937.00 and had auto expenses of $3,026.00.

4. It is noted that Gusam admits there was no creditor participation in its reorganization attempt.

5. It is admitted that Gusam intended to liquidate rather than reorganize. As the added administrative expense of appointing a trustee is minimal, this Court does not understand Gusam's vehement objection to his performing its distributive duties. It is suggested that Gusam's real fears lie in the increased possibility of investigation.