**In re ABC AUTOMOTIVE PRODUCTS CORP., Debtor.**

**Bankruptcy No. 97–11477DWS.**

United States Bankruptcy Court, E.D. Pennsylvania.

June 26, 1997.

Flamm, Boroff & Bacine, Pace Reich, Conshohocken, PA.

Allen B. Dubroff, Philadelphia, PA, for Debtor.

Ciardi, Maschmeyer & Karalis, P.C., Aris J. Karalis, Philadelphia, PA.

Joseph Minni, Office of the U.S. Trustee, Philadelphia, PA, Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court are the Objections of the United States Trustee ("UST") and Ciardi, Maschmeyer & Karalis, P.C. (the "Ciardi Firm") to Flamm, Boroff & Bacine's ("Flamm") Application for Appointment of Counsel to Official Committee of Unsecured Creditors (the "Committee"). The UST contends that the manner of Flamm's engagement evidences a disabling conflict that precludes its representation of the Committee. The Ciardi Firm also challenges the process by which Flamm was engaged. The story follows.

## BACKGROUND

On February 7, 1997, Debtor filed a voluntary petition under Chapter 11. After an organizational meeting, it appeared that there was insufficient interest to form a creditors' committee. The UST filed its statement so stating on February 26, 1997. Exhibit T–2. However, that subsequently changed and a Committee of four creditors was appointed on March 21, 1997. The creditors appointed then were Rebuilders Automotive Supply ("Rebuilders"), Valley Drive Systems, Inc. ("Valley"), Pioneer, Inc. ("Pioneer") and Belmont Automotive Co., Inc. ("Belmont").

While not stated as such, it appears that the changed interest resulted initially from the activity of Peter Carrigan, a workout specialist/liquidator who operates his own consulting firm curiously titled Hawk Management. Learning of the bankruptcy and identifying Valley's creditor interest, he contacted Valley who in turn contacted Pioneer with the objective of having both submit responses to the UST questionnaire of their interest in serving on the Committee. Their change of heart presumably came from Carrigan's offer to represent their interests on the Committee at no direct charge but rather a percentage based on the ultimate recovery in the case. While advising them that he would contact them for decisions, he nonetheless secured a power of attorney from each. On March 21 he learned from Pioneer that the Committee had been appointed, and thereafter he reached out to the other two members to get the Committee functioning and counsel selected. He reached Rebuilders but not Belmont. In what he characterized as a Committee meeting, actually a telephone conversation with Mr. Grady of Rebuilders, he was selected as Chair of the Committee based on his proximity to the Court and the time he had available for the job. Grady also had no problem with Carrigan soliciting the Ciardi Firm based on his representation from prior experience of its expertise in these matters. Ciardi was interested and accepted the engagement offered by Carrigan.

Contemporaneously Pace Reich, Esquire ("Reich") of the Flamm Firm was taking steps to secure the Committee counsel job for his firm. A former mentor of Debtor's counsel, Alan Dubroff, Reich was the person identified by Debtor's President David Perlman to trade creditors who asked, upon learning of the bankruptcy filing, "what do I do next'?" As a result, Reich was called by nine of the creditors on the twenty largest creditors list. After some preliminary explanation of the activities of a Committee, they were asked if they desired Flamm to act as counsel to the Committee. The telephone call was followed up with the transmittal of a form proxy which Reich states he has used with apparent success and no complaint for years. Exhibits A–I through A–6. The form of the proxy is central to this dispute:

[NAME] one of the twenty (20) largest Unsecured Creditors of ABC Automotive Products Corp. appoints the firm of Flamm, Boroff & Bacine, P.C. as its proxy for the limited purpose of participating on its behalf at a meeting of creditors. Flamm, Boroff & Bacine, P.C. shall have

the authority to vote on behalf of [name] at the meeting on all matters that may come before the creditors at that meeting, including the retention of professionals for any committee of unsecured creditors that may be formed. Flamm, Boroff & Bacine, P.C. will participate on behalf of [name] as a member of the Committee of Unsecured Creditors.

Six proxies, dated from February 17 to February 27, were returned to Reich who was also taking steps to get the UST to appoint a Committee which would include the persons from whom he had secured proxies. Exhibit A–7.[1] His efforts bore fruit on April 16, 1997 when the UST amended the appointment of the Committee to include three new members, Local 365, United Auto Workers Union ("Local 365"), Regina Services Corp. ("Regina") and A & B. Reich holds proxies of four of the seven members: Belmont, Regina, Rebuilders and A & B. Ciardi was supported by Carrigan's two clients, Valley and Pioneer, and Rebuilders who also gave a proxy to Reich.

After receipt of the Amended Appointment dated April 16, Reich faxed letters, Exhibit A–9, between 3:30 and 4:30 p.m. On April 17, 1997 to all members of the Committee advising them of the Amended Appointment, his holding four of the seven proxies (but not from whom) and his intention to convene a meeting of the Committee at 2:00 p.m. on Friday, April 18 at his law office in Conshohocken "for the sole purpose of appointing a chairman and appointing counsel to the Committee." Members were advised that they could be present by proxy, by telephone conference, if they so request, or in person. He then states:

It is my intent to exercise the proxies held by our firm to vote in favor of appointing Charles Gibbons the representative of Local 365 United Auto Workers Union as chairman. The Union is the largest creditor sitting on the Official Committee and Mr. Gibbons has, subject to approval by his counsel, consented to serve as chairman. It is also my intent to vote such proxies to appoint the firm of Flamm, Boroff & Bacine as counsel to the Committee and to revoke the appointment of any other purported counsel to the Committee.

Finally, he advises that if anyone objects to the above procedure, he should be informed in writing, and if the respondent is any one other than a person named on the Amended Appointment, a proxy signed by the named person should be enclosed. A copy of this letter shows as being telecopied to Dubroff and Ciardi. Reich acknowledged that neither was sent due to an oversight on the part of his secretary.

Hearing nothing from any of the members, Reich convened his meeting at 2:00 p.m. Only he was physically present. The business is transcribed in minutes he then prepared. Exhibit T–9. As proxy for Regina, he nominated Charles Gibbons, the representative of Local 365 as Committee Chair "subject to approval by Mr. Gibbons' attorney as to Mr. Gibbons serving as chairman of the Committee."[2] As proxy for A & B, he seconded the nomination. On behalf of all his

---

1. On February 27, 1997 Reich sent his six proxies to the UST along with seven questionnaires executed either by him or by the creditor and requested that the seven creditors be appointed to a committee. Exhibit A–8. Reich charges the UST with failing to promptly appoint a representative committee after that communication. The UST, on the other hand, claims that the questionnaires and proxies were inadequate. For example, certain of the questionnaires indicated "no" to the question, "Are you eligible and willing to serve?" Indeed of the seven questionnaires, only two creditors, A & B Core Supplier and Tecorp International, stated themselves that they wished to serve. Reich answered yes as proxy for three others and two stated no. One of those two, Belmont, changed its questionnaire through a subsequent proxy submitted by Reich. While the appointment of the Committee generated its own dispute, the actions of the UST in expanding the composition of the Committee have rendered that issue moot.

2. Reich had asked Gibbons as representative of the largest creditor to serve. He ultimately agreed to do so provided his counsel cleared it which he did so long as Reich would work through counsel and not directly with Gibbons. Notably Reich does not have Local 365's proxy. Notwithstanding Gibbon's agreement to serve as Chair, he did not participate in the meeting. Moreover, in the first official act requested of him, *i.e.*, to execute the Application for Appointment of Counsel, he refused to do so upon advice of his counsel who did not want the Union to get involved, a response somewhat at odds with acceptance of the Committee's leadership.

proxies, he then cast four votes in favor of the appointment. The scenario was repeated with the next motion moved, seconded and voted by Reich using the various proxies. As a result Flamm was appointed Committee counsel and "any other, or previous, appointment of counsel by the Committee, if any such occurred, by the four members originally appointed pursuant to the Appointment of Committee of Unsecured Creditors dated March 21, 1997" was revoked. Thus, with his proxies, Reich claims to have rendered the Ciardi appointment history.[3]

On April 30, 1997, almost two weeks after the election by proxy, the Committee filed its Application to be employed. The Application once again was moved and executed by Reich, in this case as proxy for Regina. Acknowledging that it is customary for the Chair of the Committee to submit the Application on behalf of the Committee, Reich testified that Gibbons, while asked to do so, refused, on advice of counsel, as "he did not want to become involved." Reich did not state whether Regina was aware that it had made the Application, a copy of which was sent to the UST, Debtor and Debtor's counsel. Neither the Chair of the Committee nor any member were served with the Application nor the notice of hearing. On the other hand, the UST has served her Objection on all interested parties, including each member of the Committee. The Ciardi Objection was served on most interested parties, omitting service of three members of the Committee, Local 365, Regina and A & B. Whether the Committee members were aware of the hearing is not clear. Only Carrigan as representative of Valley and Rebuilders appeared. Since the Application was filed, Reich has not had any contact with any member of the

Committee in connection with the Application or otherwise.

The UST objects to Flamm's retention because of her belief that Flamm, by virtue of the proxies it holds, is unable to act as both a member of the Committee and its counsel. Reich responds that notwithstanding the broad language of the proxies, it is not his practice to utilize them for any purpose other than for selection of a Chair and Committee counsel and to act on emergency matters at the first meeting of creditors. Rather he states that he seeks the members' consents to Committee action by polling the members by telephone.[4] Presumably then it would not be his intention to use the proxies any further in this case.[5] Yet even if Flamm's retention is conditioned on his not using the proxies to make decisions properly made by the members, the UST urges the Application be denied because in formulating and implementing the method of selecting Committee counsel, Flamm placed its interests ahead of those of the Committee and unsecured creditor body by denying them effective participation in the selection of their counsel. Ciardi's objection likewise goes to the lack of notice and absence of creditor participation in the election. For the reasons set forth below, I agree that the election was conducted in a totally inappropriate manner for no reason other than to ensure that Flamm would be selected. I will not approve the Committee's retention of Flamm because I have no confidence that it reflects the will of the Committee, if indeed it has one.

## DISCUSSION

■ Pursuant to § 1102 of the Code, the United States trustee is required to appoint a committee of creditors to serve as the official

---

3. Ciardi had filed an application for appointment but agrees that it is moot by reason of the expansion of the Committee membership.

4. Reich explained that in small cases such as this, he endeavors to reduce the burden in time and cost of membership on the creditors. Thus, in-person meetings are avoided. However, it is not clear why the preferred vehicle of creditor "polling" achieves that objective better than a meeting by conference call.

5. Based on Reich's representation, it appeared to me that this dispute might be resolved with one

further concession on Flamm's part. To afford members adequate information and notice, another meeting for the purpose of electing the Chair and Committee counsel would be scheduled. Since no one was objecting to the use of proxies for the purpose of these elections, presumably the result would be the same. However, if as suggested by Ciardi, the majority of the members did not support Flamm's election, they would have an opportunity to so state. Reich, standing firm behind his time-tested procedure, was unwilling to consent to the Court's suggestion.

unsecured creditors' committee. 11 U.S.C. § 1102(a)(1). The function of the committee is to represent and protect the interests of the unsecured creditors in the plan negotiation process and throughout the entire bankruptcy case. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 235, 401 (1978) (creditors' committees will be the "primary negotiating bodies for the formulation of a plan of reorganization," will represent the class of creditors from which they are selected, will provide "supervision of the debtor in possession and of the trustee, and will protect their constituents' interests."). *See also Advisory Committee of Major Funding Corporation v. Sommers,* 109 F.3d 219, 224 (5th Cir.1997) (*quoting In re AKF Foods, Inc.,* 36 B.R. 288, 289 (Bankr.E.D.N.Y.1984)) ("[I]n essence, 'the function of the creditors' committee is to act as a watchdog on behalf of the larger body of creditors which it represents.' "); *In re Subpoenas Duces Tecum Dated March 16, 1992,* 978 F.2d 1159, 1161 (9th Cir.1992) ("primary function of a creditors' committee is to advise the creditors of their rights and proper course of conduct in the bankruptcy proceedings"); *In re Arkansas Company, Inc.,* 798 F.2d 645, 649 (3rd Cir.1986) (function of unsecured creditors' committee is to "negotiate with the debtor in possession in the formulation of a plan"); Harvey Miller, *The Changing Face of Chapter 11: A Reemergence of the Bankruptcy Judge as Producer, Director and Sometimes Star of the Reorganization Passion Play,* 69 Am. Bankr.L.J. 431, 449 (1995) [hereinafter *The Changing Face of Chapter 11* ] ("The mandatory appointment of a creditors' committee was intended to provide dynamic tension with the debtor that would stimulate the reorganization process through effective and efficient

oversight and negotiation."); Michael S. Lurey et al., *The Role of the Chapter 11 Creditors' Committee,* 546 P.L.I./Comm. 171, 176 (1990) ("[T]he fundamental role of the chapter 11 committee is to maximize recovery for the creditors they represent.").

■ Creditors who serve on the committee owe a fiduciary duty to the constituents whom they represent. *Woods v. City Nat. Bank & Trust of Chicago,* 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). This duty obligates them to act with undivided loyalty for the benefit of all of the unsecured creditors. *Pension Benefit Guaranty Corporation v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corporation,* 42 B.R. 960, 963 (E.D.Pa.1984).

■ Section 1103(c) authorizes the committee to perform numerous tasks involved with the Chapter 11 case. The committee may consult with the debtor, investigate matters relevant to the case or the formulation of a plan, participate in the plan process,[6] request the appointment of a trustee or examiner, and perform such other services that are in the interest of the members whom they represent. 11 U.S.C. § 1103(c). While section 1103(c) is framed in discretionary language, exercise of certain of the enumerated functions has been found to be not necessarily permissive. Thus, in *Advisory Committee of Major Funding Corporation v. Sommers,* 109 F.3d at 224–225, the Court of Appeals for the Fifth Circuit stated that the committee has a "duty" rather than just the "power" to "use any tool available under section 1103" to accomplish its goal of acting in the best interests of the creditors. *See also* 5 Collier on Bankruptcy ¶ 1103.07 at 1103–26 (Lawrence P. King ed., 15th ed.1996).[7]

---

6. Creditors' committees can have a significant effect on the plan process. As one article explains:

> A committee can assert tremendous influence over the debtor's plan of reorganization, and if the committee finds the plan unacceptable, the plan will most likely not be confirmed. The debtor realizes that its plan will have little chance of success without the committee's approval, and, if the debtor cannot reach agreement with the committee, the committee can formulate its own plan.

Virginia Bell & Paul B. Jones, *Creditors' Committees and their Roles in Chapter 11 Reorganizations,* 1993 Det. C.L.Rev. 1551, 1576 (1993).

7. This view raises an interesting issue regarding the potential liability of an inactive and ineffective committee for failing to exercise its statutory powers. Addressing this issue, one law review article comments:

> [F]ew decisions under the Code impose liability on committees or their members for failing to exercise the statutory powers that enable committees to participate actively in the reor-

■ In performing its duties, the committee may employ counsel or other professionals to represent it. 11 U.S.C. § 1103(a). If the committee chooses to employ counsel, the Code requires that counsel be selected at a scheduled meeting attended by a majority of the committee members. *Id.*

The creditors' committee can play a vital role in a bankruptcy case. *See The Changing Face of Chapter 11, supra,* at 450 ("a creditors' committee has the potential to be a major player in a Chapter 11 case"); *Creditors' Committees Under Chapter 11, supra* note 7, at 622 (when creditors' committees properly utilize the broad powers conferred upon them under the Code, they can "play a meaningful and sometimes dominant role in the outcome of cases of any size being administered under the Code."); William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 78:9 ("an active committee can enhance the return to creditors"). However, as courts and commentators alike have noted, in many cases creditors' committees are inactive or ineffectual. *See e.g., In re Spruill,* 78 B.R. 766, 772 n. 14 (Bankr. E.D.N.C.1987) ("most creditors' committees in this district are totally inactive and ineffective"); *In re Gusam Restaurant Corporation,* 32 B.R. 832, 834 n. 1 (Bankr.E.D.N.Y. 1983) ("in too many cases where creditors' committees are formed, the creditors' committees exist in name only and are completely ineffectual"), *rev'd on other grounds,* 737 F.2d 274 (2d Cir.1984); Robert C. Aronoff, *Appointing and Organizing Official Creditors' Committees with Model By–Laws,* 20 Cal. Bankr.J. 289, 290 (1992) ("[S]tudies have shown the Creditors' Committees are often ineffective."); *Creditors' Committees Under Chapter 11 supra* note 7, at 581–582 ("[I]n the majority of Chapter 11 cases, creditors' committees have fallen short of Congress' initial expectations and have failed to utilize

the broad powers available to them."); *The Changing Face of Chapter 11, supra,* at 450 (the creditors' committee "often fails to live up to its role"). *See also* Richard I. Aaron, Bankruptcy Law Fundamentals § 4.06 ("The aspiration for the creditors' committee has not been realized."). One of the factors contributing to this situation is the lack of creditor interest in serving on the committee. *See The Changing Face of Chapter 11, supra,* at 450.

There are various reasons that creditors may be disinterested in serving on a creditors' committee. For example, they may be apprehensive about serving on the committee when they are unfamiliar with the role they would be expected to assume. They may have served on a committee before that was inactive or ineffective and become disillusioned with the committee process. William L. Norton, Jr., 4 Norton Bankruptcy Law and Practice 2d § 78:9. They may not want to be saddled with the fiduciary duty which they would owe to the committee's constituents. *Id.* They may not want a committee to be appointed, viewing the committee with its attendant costs as a drain on the monies available to pay their claims. *See The Changing Face of Chapter 11, supra,* at 461 (compensation paid to creditors' committees' professionals reduces the amount available for distribution to unsecured creditors). However, the most common reason may be that they do not want to be burdened with the responsibilities which membership on the committee would entail. *See Creditors' Committees Under Chapter 11, supra* note 7, at 618 ("Creditors frequently view service on a committee as an unwanted burden[.]"). *See also* Richard I. Aaron, Bankruptcy Law Fundamentals, *supra* ("The reluctance of busy business persons to invest their time and energy in rehabilitating the debtor is understandable especially when the duties of the

ganization process. Perhaps the same apathy and sense of hopelessness which often results in inactive committees also produces creditors who fail to consider whether the committee properly represented their interests.... However, heightened awareness among creditors and their counsel about the committee's responsibilities to those it represents may result in the emergence of claims against inactive committees and committee members. Such

claims might prompt the committee ... to carry out more fully and effectively the role Congress intended them to play in the reorganization process.

Peter C. Blain & Diane Harrison O'Gawa, *Creditors' Committees Under Chapter 11 of the United States Bankruptcy Code: Creation, Composition, Powers and Duties,* 73 Marq.L.Rev. 581, 615 (1990) [hereinafter *Creditors' Committees Under Chapter 11*].

creditors' committee broadly spelled out in Bankruptcy Code § 1103 is [*sic*] examined.").

As the facts of this case show, when creditors are reluctant to *serve* on the committee for this latter reason, attorneys may overcome the creditors' objection to service by agreeing to keep their involvement on the committee to a minimum. However, when creditor participation in the committee is limited, there is a danger that the attorney, to a large extent, becomes the committee. Rather than taking direction from actual creditors in the case, the attorney effectively controls the committee, deciding how it should proceed.[8] Given the important role and responsibilities of the Committee and the deference the Court gives to its articulated positions, the bankruptcy process is compromised when its attorney does not present the actual views of his clients but rather what he believes they should be. This problem is exacerbated by the existence of an actual conflict between the attorney and the clients he serves.

This conflict arises from the attorney's status as an administrative claimant. An attorney's fee increases as more services are performed. Because the attorney's fee is paid in full from the estate before unsecured claims are paid, unsecured creditors have an interest, unlike their attorney, in controlling the legal services which are performed.

When members actively participate in committee decisions, they can objectively consider the potential benefit of their attorney's participation versus the fees that will be generated and paid before their claims, and authorize the performance of legal services accordingly. As such, the committee will be monitoring its attorney's involvement in the case and controlling the amount of fees that are generated. When no committee members actively participate in the committee, the attorney's fees go unchecked. One potential result of an uninvolved committee is that it may do more harm than good for the unsecured creditors.

Moreover, because the committee's attorney is not an unsecured creditor, his motivation and reasons for making decisions in the case may be different from those of the actual unsecured creditors.[9] Where the creditors might negotiate, the attorney might be more likely to take a hard stand and visa versa. Accordingly, when creditors do not participate in the committee's decision-making process and the decisions are made by the committee attorney, the goal in having the committee, *i.e.*, to give creditors a voice in the reorganization process, is not realized.

There may be some who would contend that, even when the committee members fail to actively participate in the committee, unsecured creditors still benefit from the

---

**8.** Interestingly, as our Court of Appeals noted in *In re Arkansas Company, Inc.*, 798 F.2d 645 (3rd Cir.1986), one of the abuses which the Bankruptcy Reform Act of 1978 was designed to eliminate was "attorney control of bankruptcy cases." *Id.* at 649. Discussing this issue, the Third Circuit stated:

The legislative history makes clear that the 1978 Code was designed to eliminate the abuses and detrimental practices that had been found to prevail. Among such practices was the cronyism of the "bankruptcy ring" and attorney control of bankruptcy cases. In fact, the House Report noted that "[i]n practice ... the bankruptcy system operates more for the benefit of attorneys than for the benefit of creditors." H.R., No. 595, 95th Cong., 2d Sess. 92, reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6053.

As detailed in the House Report, the official committee of unsecured creditors whose function was (and still is) to negotiate with the debtor in possession in the formulation of a plan was elected by the unsecured creditors, much as the trustee was elected in a liqui-

dation case. Although the members of the committee are not compensated, the counsel to the creditors committee is paid, and, as described by the Report, "it is a lucrative position." "Thus, the Report continued, 'creditors' attorneys with proxies participate actively in the election of the members of the committee in order that they may be selected as counsel to the committee." *Id.* at 93, 1978 U.S.Code Cong. & Ad. News 6054. As in the case of the election of a trustee in liquidation proceedings, "those operating the system turn it to their own advantage." *Id.* at 92, 1978 U.S.Code Cong. & Ad. News 6053.

798 F.2d at 650.

**9.** While refusing to bar creditors from appointing their attorneys to represent them on creditors' committees, the bankruptcy court in *In re M.H. Corporation*, 30 B.R. 266 (Bankr.S.D.Ohio 1983), voiced its preference for having creditors "designate persons engaged in their businesses to serve on a creditors committee," finding that "such persons have greater insight into business affairs [which is] more useful in fulfilling the function of a creditors committee." *Id.* at 267.

committee because at least they have an attorney representing their interests in the case. I do not hear Flamm to be taking that position although the proxy it employs would leave it free to so act. On the contrary, Reich stated that it is his practice to limit the use of the proxy to selection of counsel, the Committee Chair and emergency matters which arise at the first meeting of creditors. However, it is not clear from this record whether the members who gave Flamm their proxy did so with the understanding that they would be able to delegate their responsibilities to Flamm. If they did so, then Flamm may have no principal from whom to take direction.

The use of the polling mechanism contemplated by Reich to elicit the Committee's future positions, presumably because of the anticipated difficulty of scheduling telephone conference meetings,[10] may mask the reality that the members who were uninterested in serving on the Committee before speaking with Reich still are if it means giving their time to familiarize themselves with the issues and meet as a Committee by telephone on a periodic basis. Significantly, there has been no communication from or to the members of the Committee since the "meeting" notice.[11]

■ The total lack of participation by the Committee in the selection of counsel and its Chair suggests a seeming lack of interest of the appointed members in serving in this case. Having so stated, I also recognize that the manner in which Flamm was "selected"

as counsel obviated any real opportunity for members to express their interest in the case or support for the decisions made at the "meeting." The defects in the procedure utilized by Flamm are obvious. The Committee meeting was scheduled on 24 hour notice. Members were told that their silence would be assent. If a member wished to object, Reich imposed various procedural requirements, *i.e.* the objection had to be in writing, accompanied by a proxy if the respondent is any one other than a person named on the Amended Appointment. The speed with which the "meeting" was called and held left no real opportunity for participation. Reich did not take any steps to try to arrange a telephone conference call. While all members received a copy of the meeting notice, Carrigan and Ciardi did not. It was very possible that the "meeting" held on a Friday afternoon had concluded before the members were even aware that it occurred. Since Ciardi was shown as having been notified, the members who retained Carrigan and who supported Ciardi had reason to believe that their interests in having Ciardi as Committee counsel and Carrigan as Chair were being represented. Their failure to respond may have been attributable to this impression.

I find Reich's justification for the speed with which the meeting was held not to be credible. While it is true that there had been a delay in getting the Committee functioning, there was no emergent issues that

---

**10.** As I understand Reich's approach, the polling would substitute for regular telephone meetings where there would be a full exchange of views among members.

**11.** The Committee deferred to Reich, via the use of their proxies and silence, the determination of its Chair. Reich selected and elected Local 365, a creditor that refused to participate in as ministerial an act as moving the Committee's application to retain Flamm and who has made clear that it will not act without clearance from its personal attorney. Since that attorney has a duty only to his principal, Local 365, and Local 365 as member and especially as Chair acts for and speaks for the Committee who are fiduciaries for all unsecured creditors, I question how Flamm is to get direction from this member who has indicated that it will only act as to its own interests (or apparently not at all). The appointment of attorneys to creditors' committees as opposed to the claimants themselves has been rejected in recognition that an attorney cannot

serve the interests of its client and discharge his fiduciary duty to the committee and creditors. *In re Dow Corning Corp.*, 194 B.R. 121, 134 (Bankr.E.D.Mich.1996)( allowing attorneys to serve on a committee in a representative capacity is contrary to requirements of § 1102 and "places them in the unacceptable position of concurrently serving two masters with contrary interests"). While Local 365, not its attorney, is the committee member (and presumably could *represent* the member if the member so designated him), its expressed intention to take direction from its attorney strongly suggests that the harm sought to be avoided by the ruling in *Dow* will occur here. Reich, however, was untroubled by the Chair's disability. This is but one further indication of the disparity between Flamm's expressed intention to advance positions only after consultation with the Committee and the seeming lack of will of the members to formulate them on behalf of their constituency.

needed immediate Committee action. Morever, Flamm did not file its Application to be retained until two weeks after the "meeting" was held. And then he did not even serve a copy of it on the client. Reich was aware that the originally constituted Committee had engaged Ciardi and there was likely to be a dispute over Flamm's retention. Rather than utilize procedures that were designed to evidence the Committee's active support of Flamm, Reich utilized a procedure that leaves the Court doubtful about whether the election of Flamm and Local 365 represents the will of the Committee. Had Reich provided for a reasonable notice period that perhaps would have established the Committee's support for Flamm, then the litigation, and its attendant delay in getting the Committee active, may have been avoided. Significantly, Reich refused this Court's entreaty to have another meeting called on reasonable notice to all members to conduct a new election, stating his preference to litigate Flamm's entitlement to be selected in the manner it was. That decision is simply inconsistent with Reich's statement about the need to act so quickly that only 24 hours notice could be given. I can find no reason for the summary manner in which Flamm was elected other than its concern that to do otherwise might jeopardize its claim to the job.

In utilizing the procedure Reich employed to select his firm, Reich and Flamm put their interests in getting employed ahead of the interests of the Committee in selecting its counsel and Chair. The Chair that was selected on its behalf has an apparent conflict which was not disclosed to the members. One member, Rebuilders, appears to have given Reich its proxy which he voted for Flamm but also may have supported Ciardi. In the rush to election, these issues were swept under the carpet.

It should be understood that in rejecting the procedure used by Flamm I am not holding that proxies may not be used in the process of selecting counsel. It is not uncommon at an in person organizational meeting of creditors conducted by the United States trustee for creditors who are unable to be physically present to send counsel with their proxy. That is far different than a lawyer securing the proxies and then calling and conducting a "meeting" not calculated to secure any participation other than his own to elect himself. The approach utilized here smacks of the much maligned attorney activism criticized by the Third Circuit in *Arkansas* and intended to be replaced under the current Code. When Congress expressly provided in § 1103(a) that the committee's selection of counsel "may only be done at a meeting of the committee at which a majority of its members are present," H.R.Rep. No. 595, 95th Cong., 1st Sess. 402 (1977), I seriously doubt it contemplated a meeting at which all of the members were "present" by proxy. However, it is not the fact that proxies were used, but how they were used that dictates the resolution of this contested matter.

Having found the process by which Flamm was selected to be motivated by Flamm's self interest and to have deprived the members of the Committee of any meaningful role in the decisions regarding the governance of the Committee, I will deny the Application. If the members of the Committee are truly interested in participating in this case as fiduciaries with a duty to all unsecured creditors, they will organize themselves by calling a meeting on reasonable notice at which time they will select their counsel and Chair.