In re Carl M. MAZZOCONE, Debtor.

Bankruptcy No. 93–12296DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 2, 1995.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for debtor.

Neil S. Witkes, Manio, Gold & Katcher, Bala Cynwyd, PA, for Kates Parties.

Victor Druziako, Philadelphia, PA, for Joseph Livesey.

Dean C. Waldt, Davis, Reberkenny & Abramowitz, Cherry Hill, NJ, for Stephen Console.

Jeffry M. Seiken, Rush & Seiken, P.C., Philadelphia, PA, for Christina Barbieri.

Cynthia M. Certo, Albert Bartolomeo & Assoc., Philadelphia, PA, for Debra Lord.

Arthur R. Littleton, Philadelphia, PA, for certain alleged tort victims.

Armando A. Padola, Jr., Philadelphia, PA (former special counsel for debtor).

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

*A. INTRODUCTION*

Presently before this court are two issues which the District Court remanded to this court among the many issues and appeals considered in three separate District Court Memoranda and Orders, reported as 1995 WL 113110 (E.D.Pa. March 16, 1995) ("*Mazzocone III*"); 180 B.R. 782 (E.D.Pa.1995) ("*Mazzocone II*"); and 1995 WL 80090 (E.D.Pa. Feb. 21, 1995) ("*Mazzocone I*"), arising out of the (former) voluntary Chapter 11 bankruptcy case filed by CARL M. MAZZOCONE ("the Debtor"). Those issues are (1) per *Mazzocone II*, whether this court properly dismissed this case instead of converting it to a Chapter 7 case; and (2) per *Mazzocone III*, further review of the Fee Applications as allowed to the Debtor's general bankruptcy counsel, Fox, Rothschild, O'Brien and Frankel ("the Fox Firm"), and special counsel, Armando A. Pandola, Jr., Esquire. The parties have devoted most, if not all, of their attention to the first issue, as the erstwhile appellants are not apparently opposing the disposition of the second issue reflected in the ultimate reinstatement of our prior Order of July 20, 1994.

Applying the "best interests of creditors test" ("the BICT") from the broad perspective of carefully reviewing all considerations relative to the alternatives, we continue to conclude that the most appropriate disposition of this case at present is its dismissal. However, in order to retain oversight over the non-bankruptcy alternatives for a limited time-period, we will, at least at this juncture, merely suspend all proceedings in this case, pursuant to 11 U.S.C. § 305(a)(1), for a period of about six months. After that period, we will schedule a status hearing and determine whether we will convert, dismiss, or further suspend this court's involvement in this case.

*B. FACTUAL AND PROCEDURAL HISTORY*

The Debtor, a former attorney now suspended from the practice of law, filed the instant bankruptcy case on April 16, 1993. Although an in-depth recitation of all of the facts relevant to the many disputes among the primary players in this case is not called for (and, indeed, would be a monumental task), a brief overview of that history is necessary to understand the present posture of the matters before us.

The Debtor formerly belonged to certain law partnerships, initially consisting of, *inter alia*, the Debtor; Lewis Kates, Esquire; and Joseph Livesey, Esquire. Over the years, the partners' relationship began to deteriorate, causing in-fighting and litigation which only a group of lawyers (and a former lawyer) would have an interest, and sufficient fortitude, to sustain. Livesey was allegedly "expelled" from the partnership in 1985. After the Debtor was indicted on several criminal counts arising out of his past representation of certain clients in 1989, Kates ended his association with the Debtor as well. The

Debtor's troubles peaked on December 11, 1989, when he pled guilty to two counts of an indictment against him concerning certain income tax charges arising from his having defrauded at least one of his former clients. The Debtor later served a jail term and was suspended from the practice of law.

Both Kates and Livesey have filed several actions against the Debtor, mostly in the Court of Common Pleas of Philadelphia County ("the CCP"). The Debtor has filed several countersuits in the CCP. Kates, who was apparently the Debtor's sole law partner at the time of his indictment, sought principally a division of the firm's client files handled by the Debtor and a share of continuing fees generated by these files. He also sought to liquidate and recover his share of the real estate partnership ("the RE Partnership") which he had formed with Debtor to own real property located at 1602–04 Locust Street, Philadelphia, PA ("the Property"), the site of their former joint law practice and still the site of Kates' practice.

Livesey, who had also been a member of the RE Partnership, obtained an arbiter's award to compensate him for his share of the RE Partnership. Livesey subsequently obtained a judgment on that award, and, on the eve of the judicial sale in execution on the Debtor's interest in the RE Partnership pursuant to that judgment, the Debtor filed the instant bankruptcy case.

With a fanfare of allegations, protestations, and accusations, the parties' bitter dispute came roaring into this court. Both Kates and Livesey filed large proofs of claim in the Debtor's case. The Debtor responded by removing eight (8) CCP actions involving these parties to this court. In a Memorandum reported at 1993 WL 34092 (Bankr. E.D.Pa. August 25, 1993), we denied motions to remand these cases to the CCP. In a heartbeat, numerous claim objections, dischargeability complaints, and other adversary complaints and motions were filed in this case. In the course of the case, Kates filed several appeals from our orders and decisions, most of which were put to rest in *Mazzocone I* and *Mazzocone III.*

The Debtor filed an application seeking the appointment of an examiner in this case on September 24, 1993. Kates, and the army of related parties which he controls (the so-called Kates parties, herein "K.P."), in response, filed a motion to appoint a Chapter 11 trustee, pursuant to 11 U.S.C. § 1104(a), on October 15, 1993. After a lengthy hearing on October 27, 1993, and careful consideration of the positions of all interested parties who took part in this aspect of the case, we decided to appoint an examiner. Accordingly, the United States Trustee ("the USTE") appointed David T. Sykes, Esquire, a highly regarded bankruptcy practitioner in this district, to this post ("the Examiner"). The Examiner soon determined that his efforts were best employed as a mediator of the numerous disputes among the parties.

Unfortunately, despite the Examiner's unquestioned neutrality, vigor, and skill, he was unable to take many significant steps toward the resolution of these matters without the Debtor, the K.P., or both objecting to or otherwise opposing his every turn. Despite these obstacles, the Examiner made steady, if laborious, progress. He worked out the final issues arising in the court-approved sale of certain real estate ("the NY Property") owned jointly by the Debtor and Kates' wife, Judith ("Judith") in New York City ("the City"), although not without several appeals by the K.P. (one from a Consent Order agreed to by the K.P. themselves) which were dismissed in *Mazzocone I* and *Mazzocone III.*

Nevertheless, in April, 1994, just as the Examiner appeared to be approaching the point where investigation and potential resolution of matters of tremendous longstanding differences, *i.e.,* the dissolution and distribution of the interests in the RE Partnership and the disposition of the fruits of the Debtor's post-suspension income from ongoing (mostly) workmen's compensation cases, the Debtor suddenly withdrew his support from the process. After receiving the Examiner's fifth written report and upon his advice that he was unable to achieve any further resolution at a hearing on May 5, 1994, this court entered an Order of May 6, 1994, inviting all parties in interest to file any motions to dismiss or convert the case, motions for relief from the automatic stay, or other motions

proposing any further resolutions of the case by May 17, 1994, to be heard on June 1, 1994.

In response to this Order, the USTE filed a motion to dismiss this case on May 12, 1994 ("the Motion to Dismiss"). The K.P., in turn, filed a motion to convert this case to a Chapter 7 case on May 16, 1994 ("the Motion to Convert"). Initially, the Debtor opposed both motions. However, at the hearing on June, 1, 1994, the Debtor stated that he would now consent to the dismissal of his case. With the exception of the K.P., and conditioned on the resolution of the New York Property sale and distribution of the proceeds to satisfy certain administrative claims, all parties participating in the hearing, including the Examiner, favored dismissal.

When asked at the hearing why the K.P. opposed dismissal, counsel for the K.P. stated that, since the Debtor had obtained bankruptcy protection for a certain period of time, he should not be permitted to "simply move to dismiss the case." When asked what evidence the K.P. would present to support the Motion to Convert at the hearing, counsel indicated an interest in further developing the complaints of the estate of one Philip Tragish against the Debtor for mishandling the proceeds generated by the late Mr. Tragish's workman's compensation claim, and in calling certain unidentified lawyers for unspecified testimony. Believing that the K.P. had failed to articulate any prejudice which the dismissal would effect to their interests, we indicated our intention to grant the USTE's Motion to Dismiss under certain conditions. In our dismissal Order of June 2, 1994 ("the Dismissal Order"), we acted on that intention, also attempting therein to assure that the N.Y. Property transaction and distribution of the Debtor's share of the proceeds to the administrative claimants, *i.e.*, the fees of the Examiner and the Debtor's counsel after the dismissal, would be finalized before the case was closed. We scheduled a hearing of July 20, 1994, to resolve the distribution process.

Although the N.Y. Property transaction was finalized and there was an agreement between the Examiner, the Fox Firm, and Pandola as to how to divide the Debtor's share of the proceeds from that sale, Livesey, in the interim between June 2, 1994, and July 20, 1994, attempted to attach the N.Y. Property proceeds to satisfy his state court judgment against the Debtor. Finding that Livesey was improperly attempting to execute against property *in custodia legis* of this court, *see In re Quakertown Shopping Center, Inc.,* 366 F.2d 95, 97 (3d Cir.1966); and *Ramins v. Chemical Decontamination Corp.,* 126 Pa.Cmwlth. 559, 568–69, 560 A.2d 836, 840–41 (1989), we entered an Order of July 20, 1994 ("the Distribution Order"). The Distribution Order approved final agreed distributions to Judith and the City arising out of the N.Y. Property sale and an agreement among the Examiner, the Fox Firm, and Pandola to award them $79,541.87 of a requested $94,716.37; $225,000 of a requested $378,792.21; and $25,845.60 of a requested $32,120, respectively ("the Fee Applications").

Although Livesey was the primary dissenter to the entry of the July 20, 1994, Order, the K.P. were (again) the sole appellants from this Order, as they had been to certain earlier Orders relating to the sale of the N.Y. Property and to the Dismissal Order. All of these appeals were assigned to the Honorable Lowell A. Reed, Jr., of the District Court.

In *Mazzocone I,* Judge Reed dismissed, as moot, the K.P.'s appeal from the Order approving the sale of the N.Y. Property. In *Mazzocone II,* while holding that an evidentiary hearing was not necessary to resolve the Motion to Dismiss, 180 B.R. at 785–87, Judge Reed vacated the Dismissal Order and remanded that issue to this court. In *Mazzocone III,* Judge Reed held that (1) this court was not divested of jurisdiction to enter the Distribution Order by reason of the K.P.'s earlier appeals related to the sale of the N.Y. Property or by dismissal of the case; (2) an evidentiary hearing on the Fee Applications was not required, despite the numerous objections thereto by the K.P.; but (3) since he believed that this court had indicated that it had not reviewed the Fee Applications, the fee awards to the Fox Firm and Pandola (but not the sum awarded to the Examiner, which the K.P. did not contest)

were vacated in order that we could undertake a review of the contested Fee Applications.

Focusing, as we do, almost exclusively on the propriety of the dismissal of this case requires careful analysis of *Mazzocone II*. In that decision, Judge Reed held that, while dismissal of a bankruptcy case without a prior evidentiary hearing was not improper *per se,* this court had to assume, in the absence of an evidentiary hearing, that the K.P. would indeed suffer the prejudice alleged by them if the case were dismissed. 180 B.R. at 787–88.

In pointing to the allegations of the K.P. which this court should have considered, Judge Reed referenced not the statements and arguments made by the K.P.'s counsel at the June 1, 1994, hearing, but certain averments in the K.P.'s written Motion to Convert. *Id.* at 788. Judge Reed indicated that he was troubled by this court's failure to specifically make a response to certain of these allegations, as follows:

> In his motion to convert, appellant [the K.P.] alleged that debtor was mismanaging the estate, that further litigation outside of a Chapter 7 proceeding would diminish the estate, and that debtor was improperly diverting income from the estate during the pendency of the bankruptcy.... Specifically, appellant alleged that debtor has mismanaged the estate by, for example, improperly transferring assets of the estate to others as gifts, making improper payments from the estate, failing to maintain adequate financial records, and improperly using a special counsel.... Appellant also alleged that debtor had diverted fees properly owed to the estate to his daughter.... Since these allegations, which must be assumed to be true, indicate that removing debtor from the supervision of the bankruptcy court could lead to continued diminution of debtor's assets and therefore, possibly, a reduction in the portion of appellant's claims that would be satisfied, I find that these allegations show prejudice to appellant's interests resulting from dismissal. Therefore, the bankruptcy court's order dismissing the case must be vacated and this case must be remanded to the bankruptcy court in order for the bankruptcy court to consider the allegations contained within the motion to convert (citations to the record and footnote omitted).

In response to the remand of *Mazzocone II* (and practically ignoring the remand in *Mazzocone III*) the K.P. filed, on March 16, 1995, a motion seeking substantial discovery from not only the Debtor, but also from several other parties, presumably in furtherance of preparations for a lengthy evidentiary hearing before this court on the remanded dismissal issue. On March 21, 1995, the Fox Firm filed a motion seeking to "correct the docket" to reflect that it no longer represented the Debtor ("the Fox Motion").

On March 29, 1995, this court entered an Order requiring the K.P. to assemble all materials relevant to the remands and soliciting statements from all interested parties on or before April 7, 1995, regarding the procedures which they believed that we should follow on remand. Upon receipt of these statements, we entered an Order of April 10, 1995, scheduling a status conference on April 26, 1995, the date of the scheduled hearing on the Fox Motion. Discovery in furtherance of a post-remand hearing was stayed, "since this court believes it doubtful that the District Court intended to allow further discovery on any issues after remand." The April 10, 1995, Order also provided that this court "may entertain testimony or argument" relative to the remand of the Fee Applications in *Mazzocone III* and

> may take testimony in light of the record on the [Conversion] Motion without allowing further discovery (since there is no indication in [*Mazzocone II*] that these parties should be permitted such discovery prior to any hearing on remand).

At the outset of the proceedings on April 26, 1995, we disposed of the Fox Motion by stating that the Fox Firm remained as the Debtor's counsel because of the absence of an Order permitting it to withdraw, pursuant to Local Bankruptcy Rule 9010.1(d), and because it was unlikely to obtain such an Order due to the Debtor's unwillingness to replace it. The Fox Firm has therefore (involuntarily and apparently without a prospect of add-

ing to the $225,000 previously awarded to it) remained as the Debtor's general counsel in this bankruptcy court.

We also stated that, irrespective of a passage from the Transcript of the July 20, 1994, hearing possibly indicating to the contrary which had been relied upon heavily by Judge Reed, apparently *sua sponte*, in *Mazzocone III*, we *had* reviewed all of the Fee Applications before entry of the Dismissal Order. After indicating that we had reviewed the Fee Applications again, in an abundance of caution, and again found that at least the reduced amounts awarded to the Fox Firm and Pandola in the Distribution Order were clearly warranted, and receiving only some brief and frankly unfocused comments from the K.P.'s counsel relative to that issue, we indicated our intention to reinstate the fee awards in the Distribution Order. We do so in our attached Order.

Next, we offered the parties a referral to a court-annexed mediation program which had become effective on July 1, 1994. Believing that the Examiner had already unsuccessfully acted in the role of mediator, neither the Debtor nor the K.P. expressed any interest in pursuing this suggestion.

After soliciting the present views of the interested parties regarding dismissal or conversion, which featured a shift of preference from dismissal to conversion in the positions of Livesey (strong, but difficult to understand) and the Examiner (milder, but more focused on realities), we attempted to set the parameters for any hearing to be conducted. We had already received submissions from the Fox Firm, the USTE, and counsel for several other parties within the dragnet of the K.P.'s discovery motions arguing that, in *Mazzocone II*, Judge Reed merely meant for us to clarify the reasons for the Dismissal Order and did not contemplate, or direct us to conduct, any further hearing. This position was supported by those passages in *Mazzocone II*, 180 B.R. at 785–87, indicating that an evidentiary hearing is not required on a motion to dismiss. The K.P., on the other hand, indicated an intention to take extensive discovery and conduct a hearing which would take days, if not weeks, before this issue would be finally resolved.

We found little guidance in *Mazzocone II*, or in the case law applicable to situations where the appellate court does not specify the trial court's task upon remand, to guide us in determining whether we were obliged to conduct any sort of hearing on remand and, if so, what the scope of this hearing should be. Whether the trial court need conduct a hearing on remand is generally within the trial court's discretion. *See Woolf v. S.D. Cohn & Co.*, 546 F.2d 1252, 1253 (5th Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 115, 54 L.Ed.2d 91 (1977). We are mindful that reopening a record after remand should be approached cautiously. *See Casey v. Planned Parenthood of Southeastern PA.*, 14 F.3d 848, 863 (3d Cir.1994) (conducting a rehearing after remand deemed erroneous).

It seems to us that, generally, on remand, a trial court should attempt to put the parties back to the place where the error identified on appeal occurred, in order that the parties may proceed forward from that point as they would have had we ruled in the manner that the appellate court deemed would have been appropriate. The final sentence of the passage from *Mazzocone II* quoted at page 408 *supra* appears to us to suggest that we should merely fully "consider" the allegations made in the K.P.'s Motion to Convert and then make a decision. This reading would preclude any further evidentiary hearing unless we deemed such a hearing helpful to our disposition.

We find that this court would have reached the same disposition on the Motions to Convert and to Dismiss whether it had conducted an evidentiary hearing or not. Therefore, it would have clearly been appropriate to have simply studied the Motion to Convert and then to have written a decision thoroughly explaining our disposition of the case in light of it. We concede that we did not fully explain the reasons for the entry of the Dismissal Order in detail during the June 1, 1994, colloquy, although we would observe that it was (and remains) difficult for this court to understand the arguments of the K.P. in the context of the case law relevant to the applicable Code section, 11 U.S.C.

§ 1112(b). Therefore, it appears that a further explanation of our decision, without any further "assistance" from the parties, would have sufficed.

However, we do find the pronouncements of *Mazzocone II* somewhat ambiguous. Our primary goal is to bring a timely and certain end to the issues before us, hopefully avoiding further appeals. The K.P., appellants in the past from our Dismissal Order, were, if nothing else, vigorous in their efforts to expand the record on remand. Therefore, we decided to err, if at all, on their side on the issue of a remand hearing. We therefore reopened the record on the Dismissal Motion to the K.P., at least to the extent of allowing them to make the record which they articulated that they had an interest in presenting on June 1, 1994. We also allowed the K.P. to add, as part of the record, the extensive hearing testimony on the motions to appoint an examiner or a trustee on October 27, 1993, as well as countless pleadings and deposition transcripts arising out of not only the instant bankruptcy case, but also from certain of the CCP cases as well.

There was no discovery sought by any parties, even the K.P., prior to the June 1, 1994, hearing. Therefore, we deemed any discovery prior to the hearing on remand, especially in light of our allowing years of accumulated discovery from other proceedings into the record, to be inappropriate.

We attempted to limit the evidence to that which counsel had articulated it desired to present on June 1, 1994—matters relevant to the Tragish case and testimony from (unnamed) attorneys. However, we interpreted these "restrictions" very liberally. For instance, we allowed the K.P. to call several attorneys without any certification from the K.P.'s counsel that these attorneys were in fact the lawyers referenced as potential witnesses on June 1, 1994. We also allowed the K.P. to conduct a lengthy examination of the Debtor, even though there was no specific indication that the Debtor was a prospective witness on June 1, 1994.

Even with our somewhat pared-down approach to the hearing on remand, the hearing resulted in two full days of testimony (and one incipient physical altercation between the Debtor and Kates). Despite our attempts to focus the parties on the BICT, much of the testimony presented by the K.P. was irrelevant to the standards for this test. Our reading from the passage in *Mazzocone II* quoted at page 408 *supra* at the outset of the second day of hearings to attempt to focus the K.P. on what we clearly had a mandate to consider was largely unsuccessful. It appears to us that the K.P. were hoping to shock this court with stories of the Debtor's past (and largely pre-petition) conduct in the hope that the "facts" would carry the day. Despite healthy amounts of innuendo, however, the K.P. generally were unable to prove any post-petition conduct by the Debtor which would convince us to convert the case.

It is telling that perhaps the best evidence supporting conversion was elicited by this court *sua sponte*. We sought out the views of the Examiner, who perhaps alone was able to articulate a benefit to conversion which had some reference to the realities of what conversion would entail.[1] We also learned, as a result of our own questions to the Debtor, that the Debtor has substantial unencumbered assets. These facts, in contrast to the very little relevant evidence that the K.P. was able to submit, alone changed the complexion of the record re-submitted for our resolution after remand to the benefit of the K.P.

We allowed all interested parties to file simultaneous post-hearing briefs in support of their positions on or before May 19, 1995. We received modest briefs from both the Debtor and Livesey and a mammoth brief (approximately three times as large as the other two together) from the K.P. Despite its length, this brief includes but five citations addressing the crucial issue of the appropriate disposition of this case under § 1112(b), none of which really support its position.[2]

---

1. Indeed, the Examiner's analysis was almost too practical. It was clear that he envisioned some lucrative role for his firm as counsel for a trustee in the event of conversion.

2. Three of these cases, *In re Monsour Medical*

## C. DISCUSSION

### 1. THE BICT REQUIRES CONSIDERATION OF THE BEST INTERESTS OF ALL OF THE CREDITORS AND OF THE DEBTOR'S ESTATE.

Section 1112(b) of the Bankruptcy Code, which governs dismissal and conversion of Chapter 11 cases, provides that,

> on request of a party in interest or the United States trustee, and after notice and a hearing, the court may convert a case under this chapter [11] to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—[ten specific situations are described].

There is no dispute by any party regarding the presence of sufficient "cause" to dismiss or convert this case from a Chapter 11 case. Therefore, it is not necessary to further address the issue of whether any of the ten enumerated situations which may give rise to "cause" exist, or the presence of "cause" in general. The Debtor clearly has no further desire to reorganize under Chapter 11, and no other interested party has ever indicated any intention to file a Chapter 11 plan. Therefore, the only issue before us is determining whether conversion or dismissal best satisfies the BICT.

Our most detailed analysis of § 1112(b) appears in *In re Smith*, 77 B.R. 496, 499–503 (Bankr.E.D.Pa.1987). Therein, we noted our distinct preference for analyzing whether a dismissal or conversion of a Chapter 11 case is appropriate under § 1112(b), as opposed to an analysis under the vague and uncodified rubric of "good faith." *Id.* at 500–01. *See also In re Lilley*, 181 B.R. 809, 810–12 (Bankr.E.D.Pa.1995) (reiterating our *Smith* holding that there is no good faith filing

requirement under any contemporary bankruptcy Chapters).

We also noted, in *Smith, id.* at 501,

> our preference for dismissal of a case instead of conversion to Chapter 7. When a Chapter 11 case is dismissed, the debtor has the option of whether to refile under Chapter 7 or not. We believe that it may be unfair to convert a voluntary Chapter 11 case into, effectively, an involuntary Chapter 7 case unless specific actions on the part of the Debtor warrant it. *Cf. In re Geller*, 74 B.R. 685, 689 (Bankr.E.D.Pa. 1987) (in deciding whether to allow the debtor's attempt to voluntarily dismiss the case the court looked with certain disfavor upon the consideration that failure to allow dismissal effectively transforms a voluntary case into an involuntary one). A creditor moving to convert can always follow a dismissal with the filing of an involuntary petition if such a proceeding is deemed appropriate.

█ The issue presented by the instant case is distinct from that before us in *Smith* because, there, the movants sought dismissal or conversion of the cases in issue, with no particular preferences, and the respective debtors opposed either dismissal or conversion, as requested in the motions. This is the most conventional setting in which § 1112(b) motions are litigated. However, in the instant case, the Debtor does not oppose the USTE's Dismissal Motion. Therefore, considerations similar to that expressed in the above quote from *Smith, supra,* and in the *Geller* case cited therein, which involves a debtor's request to voluntarily dismiss a Chapter 11 case under § 1112(b), come into play. However, we must reiterate that, where an interested party other than the debtor, particularly a completely neutral,

Center, Inc., 154 B.R. 201 (Bankr.W.D.Pa.1993); *In re Minnesota Alpha Foundation*, 122 B.R. 89 (Bankr.D.Minn.1990); and *In re Sirius Systems, Inc.*, 112 B.R. 50 (Bankr.D.N.H.1990), resulted in *dismissal* rather than *conversion* of the respective bankruptcy cases in issue. A fourth, *In re Superior Siding & Window, Inc.*, 14 F.3d 240 (4th Cir.1994), resulted in a remand of a dismissal order to reconsider conversion, but expressly holds that, in applying the BICT, the wishes of a majority of the creditors, without considering

how the interests of all creditors are served, is inappropriate. All of these cases are merely string-cited for general propositions which the K.P. deem supportive of their cause. The fifth, *In re Mechanical Maintenance, Inc.*, 128 B.R. 382 (E.D.Pa.1991), is discussed *passim.* It should be noted, however, that *Mechanical Maintenance* arose on a debtor's motion to voluntarily dismiss its case. The instant case was dismissed on the basis of the USTE's Motion to Dismiss.

"watchdog" party such as the USTE, feels strongly enough about the proper disposition of a bankruptcy case to move for its dismissal, we are even more strongly inclined to dismiss a case than if only the debtor is pressing for this result.

■ In *Geller,* we held that, when a Chapter 7 or Chapter 11 debtor requests the dismissal of a bankruptcy case, such relief should be granted unless the party opposing that relief establishes that "plain legal prejudice" to creditors would otherwise result. 74 B.R. at 690. Our approach to § 1112(b) dismissal requests by a Chapter 11 debtor was criticized as too permissive in *Mechanical Maintenance, supra,* 128 B.R. at 386–88. That case held that, by requiring objecting creditors to show "plain legal prejudice" in order to defeat a debtor's request for dismissal, we were possibly applying a test which was inconsistent with the BICT, the only test which appears in the unambiguous language of § 1112(b). *Id* at 387–88. We believe, however, that the decision of the *Mechanical Maintenance* court has overcompensated for what it perceives to be the establishment of a too-permissive voluntary dismissal test by suggesting an approach to the BICT which ignores the context in which it must be applied and, in the process, minimizes the language of the statute which utilizes the plural form of the term "creditor" and contains the phrase "of the estate."

We begin our analysis by taking a closer look at the benefits and obligations of bankruptcy. The Bankruptcy Code attempts to establish an orderly process through which a debtor may be reorganized or liquidated. In order to achieve that end, certain benefits and obligations are assigned to those partaking in the process. For example, a debtor may enjoy a discharge or the protections of the automatic stay, but, in turn, is obligated to, *inter alia,* liquidate non-exempt assets, contribute disposable income to the payment of creditors, and retire secured debts or relinquish the underlying collateral. Similarly, a creditor may be entitled to priority status, adequate protection payments, or equal treatment with similarly situated creditors, but, in turn, will be subject to, *inter alia,* the

automatic stay and the cramdown provisions of § 1129(b).

■ The benefits that enure to a bankruptcy participant have no independent justification and should have no independent life of their own, but should properly be bestowed only in the larger context of the give and take of a full-blown bankruptcy proceeding. We thus are skeptical of those cases holding that conversion is appropriate simply in order to assure equal distribution of the debtor's assets to all creditors and to avoid races to the court house. *See, e.g., Superior Siding, supra,* 14 F.3d at 243; *In re Cooper Properties Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr.W.D.Tenn.1986); *In re Gilbert Broadcasting Corp.,* 54 B.R. 2, 5 (Bankr. D.N.J.1984); *In re Gusam Restaurant Corp.,* 32 B.R. 832, 836 (Bankr.E.D.N.Y.1983), *rev'd on other grounds,* 737 F.2d 274 (2d Cir.1984); and *In re Bonded Mailings, Inc.,* 20 B.R. 781, 785 (Bankr.E.D.N.Y.1982). Without first determining that a bankruptcy liquidation (with all that it entails) is appropriate under the facts of the case, it does not follow that preservation of equal distribution for its own sake is warranted, since that policy is neither inherently desirable nor justified outside of bankruptcy. Indeed, the state courts are properly utilized by creditors trying to get a jump on other creditors securing a larger piece of a debtor's assets. Such are the realities of commerce.

■ Only when a Chapter 11 debtor has no intention or ability to reorganize or perform its own liquidation or otherwise fulfill pertinent bankruptcy obligations should a debtor not be permitted to remain in bankruptcy simply in order to enjoy the protections of the automatic stay. *See, e.g., Cooper Properties, supra,* 61 B.R. at 536 ("[D]ebtors seeking the protection of the bankruptcy court must have real debt, real creditors, and a legitimate purpose; the code must not be used merely to harass creditors."); *In re Mogul,* 17 B.R. 680, 681 (Bankr.M.D.Fla. 1982) (same); and *In re Oak Winds,* 5 B.R. 69, 71–72 (Bankr.M.D.Fla.1980) (same). Likewise, when the bankruptcy purpose of a case no longer exists (or never existed), a creditor should not be permitted to prolong or sustain a case merely to take advantage of

benefits bankruptcy offers to creditors. Considering that Congress weighed the competing interests of many parties when developing the bankruptcy process, and crafted a compromise which affects them all, applying § 1112(b) in a way which preserves this parallelism appears warranted.

■■ Viewed in this perspective, pronouncements regarding the BICT such as are contained in *Mechanical Maintenance* appear overboard, and arguably upset the careful balance struck by Congress. For example, in *Mechanical Maintenance*, the court concluded that, because the objecting creditor would lose its § 506(c) claims if that case were dismissed, the court's decision to dismiss the case did not satisfy the BICT. 128 B.R. at 388.

In this case, the K.P. suggest that the BICT may not have been satisfied because, among other things, the K.P. would lose the benefit of trustee oversight if this case were dismissed. In neither instance, however, are the respective benefits "at risk" indelibly guaranteed to creditors. Indeed, such benefits are only proper when they are a component of the much more involved full-blown bankruptcy procedure. To keep a case open merely to preserve a creditor's access to such benefits when the case is otherwise ripe for dismissal is no more appropriate than allowing a Chapter 11 debtor the protections of the automatic stay under that Chapter when there is no intention or ability to reorganize. Indeed, allowing such requests to creditors may be tantamount to placing the court's imprimatur on their attempts to improperly secure an advantageous forum.[3] *See In re SB Properties, Inc.,* 185 B.R. 206, 209 (Bankr.E.D.Pa.1995) (court dismisses case because "this is essentially a two party dispute which was obviously commenced for the sole purpose of relocating pending litigation over the liquidation of the Property from the Montgomery County Court of Common Pleas to this Court."); and *In re Heritage Wood 'N*

*Lakes Estates, Inc.,* 73 B.R. 511, 514 (Bankr. M.D.Fla.1987) (court dismisses debtor's Chapter 11 case because, *inter alia,* one of the main reasons that the debtor filed bankruptcy was to avoid litigation in state court, a perceived hostile forum). *Cf. In re Capistrano Associates,* 66 B.R. 421, 422 (Bankr. S.D.Fla.1986) (creditor's desire to have its dispute with debtor decided by a speedy bankruptcy court as opposed to a state court is not a sufficient basis to prevent dismissal pursuant to § 305).

■■ It also must be recalled that analysis of the interest of one creditor (or group of creditors) of a debtor is not the equivalent of the BICT. *See In re H.R.P. Auto Center, Inc.,* 130 B.R. 247, 256 (Bankr.N.D.Ohio 1991) ("[The movant] . . . request[s] conversion rather than dismissal, but fail[s] to discuss why the former would best serve the interests of the creditors and the estate."). *Cf. Capistrano, supra,* 66 B.R. at 422 (performing a similar § 305 dismissal analysis, the court decides to dismiss the case for the collective benefit of all creditors notwithstanding a single creditor's objection, noting that "[a]lthough [the objecting creditor] professes an interest in the welfare of other creditors, *its real and only reason for wishing to stay in this court is that its dispute with the debtor would be tried and decided quicker in this court than in the state court.*") (emphasis added). *Compare In re Staff Investment Co.,* 146 B.R. 256, 261 (Bankr.E.D.Cal.1993) ("It is not necessary that the interest of *every* creditor actually favor conversion. . . . The interest of a single creditor with a large enough claim will suffice.").

■■■ Of course, this is not to say that a single creditor's desire to preserve certain bankruptcy benefits can never tip the BICT in favor of conversion. *See Staff, supra,* 146 B.R. at 260–61. However, even the *Staff* court, which concluded that the preference of

---

**3.** As an aside, we note that attempting to draw a distinction between a debtor's efforts to dismiss a Chapter 11 as opposed to a Chapter 7 case, and therefore refusing a debtor's request to dismiss its Chapter 11 case in favor of conversion, as the court appears to have done in *Mechanical Maintenance,* is illusory, because it amounts to a cum-

bersome and expensive route to the same result. If debtor seeks dismissal again once in chapter 7, *see* 11 U.S.C. § 707, it will be able to avoid the BICT altogether because, unlike § 1112(b), once cause is found under § 707, dismissal follows unless "plain legal prejudice" to creditors is established.

414

a single creditor might well control the disposition of the "best interest of creditors" portion of the BICT, nevertheless conducted an independent analysis of the "best interest of the estate" portion of the test as well. *Id.* at 261. We have not found a single case where the preference of a single creditor was held to be dispositive of the BICT. That is not to say that the interests of a self-motivated creditor which are at variance with the interests of a debtor who "wants out" of a bankruptcy do not carry significant weight, particularly in the context of an involuntary bankruptcy case where it fairly can be assumed that the debtor (and perhaps a number of other, non-petitioning creditors) never wanted to be in bankruptcy in the first place. In the final analysis, it must be emphasized that the BICT is a case-by-case, fact-specific test. Thus, just because a creditor's desire to preserve the benefits of bankruptcy may carry more weight in one context does not mean that such desires should carry the day in every case.

We therefore conclude that the fact that one objecting creditor would do better in bankruptcy than out is not dispositive of the BICT, and may not even be particularly relevant to the analysis. A more global approach to the BICT is appropriate.

### 2. *PROPER APPLICATION OF THE BICT TO THE FACTS IN ISSUE WOULD RESULT IN REINSTATEMENT OF OUR ORDER DISMISSING THIS CASE.*

We now turn to the facts of this case, as further developed at the April 26–27, 1995, hearing, and the numerous documents incorporated therein, in order to determine if they weigh in favor of conversion or in favor of dismissal. We find that the following factors support dismissal over conversion:

1. The Debtor and the UST both favor dismissal. *See* cases cited *infra* in the discussion of factor 2 in support of conversion. *But see Staff, supra,* 146 B.R. at 261 ("The best interest of the debtor is *not* specifically a factor under section 1112(b)."). *Compare* pages 420–422 *infra,* where we decide to suspend these proceedings under 11 U.S.C. § 305, a Code section

which very much takes into consideration the best interest of the Debtor.

2. State law proceedings were pursued after our prior dismissal and are poised to go forward. Indeed, we are told that the CCP has appointed D. Donald Jamieson, Esquire, former Chief Judge of the CCP, as a special master to oversee the resolution of all of the disputes between the K.P., Livesey, and the Debtor. *See In re Melp, Ltd.,* 143 B.R. 890, 893 (Bankr.E.D.Mo. 1992) ("Bankruptcy Court should not be used as an alternative approach to state court procedures to resolve intra-company management and ownership disputes."); and *Heritage Wood, supra,* 73 B.R. at 514 ("[I]f the matter can be dealt with by another forum, better equipped to do it and in a better position to deal with a dispute between two parties or just a few parties, the bankruptcy court should refrain from exercising its jurisdiction."). *Accord, SB Properties, supra,* 185 B.R. at 209.

3. The Debtor no longer wishes to utilize the bankruptcy process for any of its intended purposes. *See Melp, supra,* 143 B.R. at 892 ("Dismissal is in the best interest of creditors because since the Debtor has paid all its pre-petition creditors and is remaining current on its post-petition obligations, there is no need for continued oversight by the Bankruptcy Court."); *Heritage Wood, supra,* 73 B.R. at 514 ("[The] bankruptcy courts should become involved in cases only if the bankruptcy court's services are needed to truly reorganize a debtor who is having financial problems...."); *Cooper Properties, supra,* 61 B.R. at 536 ("[D]ebtors seeking the protection of the bankruptcy court must have real debt, real creditors, and a legitimate purpose...."); and *Mogul, supra,* 17 B.R. at 681 ("It has been long recognized that one who invokes the protection of the bankruptcy laws must do so in order to accomplish and further the expressed legislative aim of the particular Chapter and not for any other purpose.").

4. The overriding disputes between the K.P. and the Debtor are in the nature of two-party disputes involving only state-law

issues. *See, e.g., SB Properties, supra,* 185 B.R. at 208 (court dismisses Chapter 11 case because "it is manifestly clear that this is simply a two party dispute"); *Melp, supra,* 143 B.R. at 891 ("Debtor's bankruptcy case has become solely a dispute between the Debtor's general and limited partners over the lucrative proceeds of . . . [a] lease."); *In re Nugelt, Inc.,* 142 B.R. 661, 669 (Bankr.D.Del.1992) (dismissal is proper because "the case is essentially a two-party dispute between the Debtor and [its bank]."); *Heritage Wood, supra,* 73 B.R. at 514 ("This is basically no more than a two-party issue that can be resolved in the state court and perhaps in the federal district court on a RICO basis."); and *Cooper Properties, supra,* 61 B.R. at 536 (a bankruptcy case should be dismissed when the debtor's "reorganization effort is essentially a two party dispute aimed at frustrating one creditor. . . .").

■ 5. The protection sought by the K.P. against the unlawful dissipation of the Debtor's assets is also clearly available under applicable state law.[4] *Cf. Melp, supra,* 143 B.R. at 892–93 ("[A] state court receiver may be appointed to ensure orderly operation of the Debtor's business and distribution of its handsome profits until such time as the partnership litigation is resolved.").

6. The K.P.'s preference for conversion is at least partially in the nature of forum shopping. *See, e.g.,* cases cited at pages 413–414 *supra.* The K.P. seem to be seeking a forum in which the Debtor's hands are tied by his subjection to a trustee's control and his defense is left to a less interested party, while the K.P. can contin-

ue their equally litigious posture unabated. While this may well be a sound strategic goal, it is not one that must be sanctioned by this court, and appears to us to be at odds with the adversary system generally. We do not mean to suggest that we condone the delay tactics of which the Debtor is accused. However, we are confident that the state court is as competent to prevent such abuses as we are.

7. As indicated by our discussion at page 415 n. 4 *supra,* the K.P. misconstrues the role and powers of a Chapter 7 trustee. A Chapter 7 trustee may not be able (or have the incentive) to do very much about the Debtor's alleged dissipation of assets. Nor will a Chapter 7 trustee assist the K.P. in the pursuit of their claims when there is no general benefit to the estate in doing so. Indeed, it is more likely that the Chapter 7 trustee will oppose Kates' claims in order to preserve the Debtor's assets for the benefit of the entire creditor body. If a dissipation of assets is found, it is also possible that the trustee may decide to sue the Debtor for the benefit of the entire estate, thus competing with the K.P. for the Debtor's available assets.

8. Conversion to a Chapter 7 case entails certain added expenses, including the expenses of the Chapter 7 trustee and the trustee's own professionals. *Cf. In re All American of Ashburn, Inc.,* 40 B.R. 104, 108 (Bankr.N.D.Ga.1984) ("[T]he relative administrative expenses under Chapter 11 versus Chapter 7 must be considered. . . ."); and *In re Alves Photo Service, Inc.,* 6 B.R. 690, 693–94 (Bankr.D.Mass. 1980) (same).

---

**4.** To the extent that the K.P. are concerned about the lawful dissipation of the Debtor's assets to cover legitimate litigation costs, etc., such expenses may well occur in Chapter 7 as well. *But see In re Silverstein,* 94 B.R. 284, 291 (Bankr. E.D.N.Y.1988) ("The Court does not agree . . . that dismissal, rather than conversion to Chapter 7 is in the interest of the creditors and the estate. There are substantial assets present here which will be consumed by the debtors if a trustee is not put in charge."). The K.P. seem to suggest that Chapter 7 is preferable because a Chapter 7 trustee is likely to permit the K.P.'s claims to be allowed unchallenged. It is our observation, however, that, if nothing else, the amount of

these claims is extremely questionable and, given the litigious tendencies of the K.P., it is unlikely that these matters will be settled without considerable litigation. It is a Chapter 7 trustee's obligation to contest claims against the estate when defenses to such claims are available. We cannot say that Debtor has no defenses to either Kates' or Livesey's claims. Therefore, we are not convinced that the other profuse litigation spawned by these disputes will magically dry up once a Chapter 7 trustee is appointed. Resuscitation of this case will automatically give rebirth to the score of adversary proceedings filed in it. *See generally* page 415, *infra,* factor 7 in favor of dismissal.

9. No party has alleged that preference recoveries or other bankruptcy causes of action will be lost if the case dismissed. *See generally Staff, supra,* 146 B.R. at 262 (conversion may be the preferred option when a Chapter 7 trustee's avoidance actions would be lost upon dismissal); *In re T.S.P. Industries, Inc.,* 117 B.R. 375, 379 (Bankr.N.D.Ill.1990) (same); *Silverstein, supra,* 94 B.R. at 291 (same); and *Geller, supra,* 74 B.R. at 691 (same). *See also H.R.P., supra,* 130 B.R. at 257; and *In re T.S.P. Industries, Inc.,* 120 B.R. 107, 111 (Bankr.N.D.Ill.1990) (both courts refusing to convert cases where no known avoidance actions exist). *Compare Mechanical Maintenance, supra,* 128 B.R. at 388–90 (dismissal would destroy certain creditors' § 506(c) claims). To the extent that the Debtor made fraudulent conveyances, creditors can always pursue them under applicable state law. *See* 12 Pa.C.S. §§ 5101–5110.

10. Dismissal preserves the time and resources of this specialty court from the onerous and time consuming, non-bankruptcy related issues arising in the disputes between the K.P. and the Debtor. *See* page 414 *supra* (cases cited in support of factors 2 and 3).[5]

We find that the following factors support conversion over dismissal:

1. The Debtor has substantial, unencumbered assets which could be administered by a Chapter 7 trustee.

2. Conversion is now supported by more parties than before—most notably, it now has a lukewarm endorsement by the Examiner. *Compare In re Brauer,* 80

B.R. 903, 912 (N.D.Ill.1987); *In re Great American Pyramid Joint Venture,* 144 B.R. 780, 793 (Bankr.W.D.Tenn.1992); and *In re Rose,* 86 B.R. 439, 442 (Bankr. E.D.Pa.1988) (all concluding that creditor consensus is relevant to the BICT analysis), *with Superior Siding, supra,* 14 F.3d at 243; and *Staff, supra,* 146 B.R. at 261 (both concluding that majority rule is not a substitute for the BICT and even may be of minor significance).

3. The K.P. presented some evidence that if the case is dismissed, the Debtor's assets might well be dissipated. *See* page 28 n. 4 *supra;* and *Silverstein, supra,* cited therein. For example, following our initial dismissal of this case, the Debtor sold one of his classic automobiles, which he previously claimed to have given to his daughter as a gift, in order to pay his lawyer a retainer in conjunction with the CCP proceedings.

4. There is some (but upon close analysis, not a great deal) of appeal to the K.P.'s equitable argument that the Debtor brought everyone into the bankruptcy court and now, after a substantial undertaking of time and resources by his creditors, should not be allowed to bail out because the forum no longer suits his purposes. *Cf. Gusam Restaurant, supra,* 32 B.R. at 836 ("[The creditors] have been required to wait patiently pending the administration of this case for a full year. Such patience has as its consolation only the assurance that the debtor's assets will be divided fairly. The dismissal of this case at this late date would surely prejudice some of [the] creditors....").[6]

---

5. The issue is not merely one of "convenience" to this court, as the K.P. suggest. Limited as we are in our exercise of our jurisdiction generally, this court does not have the ability to take on all disputes brought to it, no matter how interesting or exciting they may be (and the instant case is not without some most entertaining color). However, the "right thing to do," as the K.P. put it, must include the exercise of our jurisdiction only where Congress has statutorily authorized this court to do so.

6. In a related argument, the K.P. argue that the only reason that they cooperated with the Examiner's quasi-mediation program for so long is because they believed that the case would auto-

matically be converted and a trustee appointed if the Examiner's efforts failed. They cite to language in the Examiner's initial report to the effect that the case should be converted if his program fails in support of this contention, and appear to go so far as to suggest that, because of our approval of that report, we should have converted the case as a matter of course once the Examiner's program proved unsuccessful. We disagree with the K.P.'s interpretation of the Examiner's initial report, and our "acceptance" thereof. First, the Examiner did not make his findings in the context of the dismissal versus conversion debate which we now face. Moreover, the Examiner only recommended a trustee as an alternative to his own proposed dispute

5. There is no question that Debtor engaged in unethical and fraudulent practices in the past. The K.P. assert vigorously that such below-board dealings continued post-petition.[7] *See In re Palmer,* 134 B.R. 472, 476–77 (Bankr.D.Conn.1991) (conversion appropriate when the court fears that the debtor may have mismanaged her business and failed in her fiduciary duties to the estate); *In re Cloisters of Brevard, Inc.,* 117 B.R. 722, 723 (Bankr. M.D.Fla.1990) (conversion proper when debtor "simply failed to exercise its fiduciary duty as a debtor-in-possession."); *Gusam, supra,* 32 B.R. at 836 ("If in fact the debtor has gone so far as to perpetrate a fraud, without effective creditor participation, such conduct will not be disclosed [unless a Chapter 7 trustee is appointed]."); and *Mogul, supra,* 17 B.R. at 682 ("In light of the allegations that this Debtor is fraudulently secreting substantial assets, it is evident that in order to assure a full and complete investigation of the affairs of the Debtor a dismissal of this case would not be appropriate.").

Despite the numerous factors supporting both options, choosing the proper disposition of this matter is not a difficult task.

■ We note considerable authority for the proposition that, like a judgment call of a sports official, any decision in a situation where sufficient factors exist to justify either a decision to convert or one to dismiss a case, the exercise of its discretion by the bankruptcy court should be respected. *See In re Trans Materials Co.,* Bankr. No. 94–

15712BIF, slip op. at *14 (Bankr.E.D.Pa. March 17, 1995); and *In re Ithan Corp.,* Bankr. No. 94–12192DWS, slip op. at *10 (Bankr.E.D.Pa. Aug. 26, 1994). Given that the initial determination under § 1112(b) is thus left to the sound discretion of the bankruptcy court and is not ordinarily disturbed on appeal, the reviewing court's deference to even minimal findings of fact by the bankruptcy court is consistent with Congressional intent. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978); and H.Rep. No. 595, 95th Cong., 2d Sess. 405–06 (1978) U.S.Code Cong. & Admin.News pp. 5787, 5903, 6361, 6362 (both reports state that § 1112(b) gives "wide discretion to the court to make an appropriate disposition of the case" and allows the bankruptcy court "to use its equitable powers to reach an appropriate result in individual cases."). *Accord, In re Sullivan Central Plaza I, Ltd.,* 935 F.2d 723, 728 (5th Cir.1991); and *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir.1989). *Cf. In re Brown,* 951 F.2d 564, 572 (3d Cir.1991) (in the context of a § 1112(b) decision, the court concluded that it could not "affirm the district court's decision ... reversing the bankruptcy judge on an equivocal record 'without violating the traditional allocation of differing competencies to the various levels of our hierarchial judicial system' "), quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 104 (3d Cir.1981).

We also note considerable authority for the proposition that a bankruptcy court is not required to explain the reasons for dismissal or conversion in detail. *See In re Koerner,* 800 F.2d 1358, 1368 (5th Cir.1986) ("The

resolution process, to which the parties, in fact, consented. Finally, and most importantly, we could not have bound ourselves to convert the Debtor's case upon the happening of certain future contingencies. Conversion under § 1112(b), like dismissal, is only proper after this court examines all pertinent factors at the time of the request to convert or dismiss. Not even the K.P. argue that we could have or did conduct a proper § 1112(b) analysis at the time we approved the Examiner's initial report.

The K.P. made a similar argument regarding the position of the USTE in light of the USTE's steadfast support for dismissal of the case. They argue that, since the USTE supported the appointment of a Chapter 11 trustee at the close of the October 27, 1993, hearing, it is inconsistent for the USTE to now support dis-

missal. However, on October 27, 1993, no party was arguing in favor of the alternative of dismissal in this case since October 27, 1993. Therefore, it makes little sense to argue that the USTE's position on October 27, 1993, bears any significance to whether the case should be converted or dismissed at this time.

7. The K.P. allege that the Debtor's "bad faith" in his prior actions may serve as grounds to convert a case and cite to *In re Monsour Medical, supra,* 154 B.R. at 208, in support of this principle. In fact, *Monsour Medical* stands for the proposition that a case filed in bad faith should be *dismissed.* *Id.* In any event, we doubt whether such a "bad faith filing" analysis is ever appropriate. *See Lilley, supra,* 181 B.R. at 810–12.

bankruptcy judge is not required to give exhaustive reasons for his [§ 1112(b)] decision."); *In re Fossum,* 764 F.2d 520, 521–22 (8th Cir.1985) (the bankruptcy court's one line, conclusory statement in support of its decision to dismiss a Chapter 11 case, which "could have been more detailed and more direct," was nonetheless found sufficient); *In re Nardi,* 1991 WL 255681, slip op. at *2 (E.D.Pa.1991) ("A bankruptcy judge is not required to give exhaustive reasons for a decision to convert a case."); and *Brauer, supra,* 80 B.R. at 911 (although a bankruptcy court dismissed Chapter 11 case "without first resorting to lesser sanctions and without expressly considering whether dismissal was in the creditors' best interests, such 'omissions' were not an abuse of discretion...."). However, since the District Court, in *Mazzocone II,* remanded the matter to us with the implicit instruction to better articulate our resolution of the issue, applying the BICT, we conclude that we are obliged to relate our reasoning process in some detail. The instant Opinion should suffice.

We must finally further note that we find that the K.P. and their supporters have failed, even with our allowing them to bring in all of the evidence which they have amassed against the Debtor over the past decade of litigation and to supplement the record with two days of testimony on remand, to prove any of the allegations of circumstances which Judge Reed, in the critical *Mazzocone II* passage quoted at page 408 *supra,* deemed to be significant. The only evidence concerning gifts of the Debtor's assets related to evidence that the Debtor sold a classic automobile allegedly given his daughter to pay a retainer to counsel for representation in litigation in the interim period between dismissal of this case on June 2, 1994, and the decision in *Mazzocone II.* However, this sequence of events does not suggest the Debtor's making of any further gifts, but instead his taking back of a prior gift to pay for his own legal bills. An action cancelling a former gift did not deplete the Debtor's bankruptcy estate.

With respect to the K.P.'s charges of the Debtor's making improper payments, the only reference point in the evidence present-ed related was to the retainer paid to counsel. However, given the litigious proclivity of the K.P. in its actions against the Debtor, as evidenced by its wasteful and frivolous appeals to the District Court from certain of our previous Orders, it ill befits the K.P. to level the charge of pursuit of frivolous litigation at the Debtor. Not only have the K.P. been, if anything, more contentious than the Debtor, but also they have been the very parties responsible for generating many of the lawsuits to which the Debtor, in most instances, was obliged to respond.

We expressly find that the debtor did not misuse Pandola, his appointed special counsel. Most of Pandola's efforts in this case related to efforts to work with the Examiner in mediating this dispute. These were acts in furtherance of a worthy aim, and no party has criticized Pandola's role in it.

The K.P. attempted, through extensive questioning of Christina Barbieri and the Debtor during the remand hearing, to show that referral fees were improperly paid from Barbieri to the Debtor's daughter to the Debtor. In fact, the unrebutted testimony of Barbieri and the Debtor tended to show that Barbieri paid few referral fees to the daughter, and the Debtor ultimately received only the modest sums which were properly due to him. In no sense did this evidence tend to prove that the Debtor diverted fees due to him to his daughter, as Judge Reed believed that the K.P. were alleging. If this court were, as Judge Reed states, obliged to assume these allegations as true for purposes of the hearing of June 1, 1994, we must now state that we find these allegations to be unproven and worthy of little, if any, consideration.

Although we reminded the K.P., in the course of the hearing, that they must address the issues raised in *Mazzocone II* if they wished to succeed in the Motion to Convert, they simply refused to do so. Instead, they continued to focus upon the facts of the Tragish case and other incidents which occurred many years pre-petition. Their post-hearing brief, though extensive, is lacking in discussion of the issues highlighted in *Mazzocone II,* and it contains no case authority in support of any of their requests from this

court. Much of this brief focuses on the extensive litigation in which the Debtor is engaged, myopically skimming over the fact that the K.P. have been equally vigorous in generating most of it.

Certain portions of this brief reflect a clear misunderstanding of the practicalities of administration of this case in a Chapter 7 scenario. The K.P. attribute almost mystical powers to a trustee to settle claims and bring order out of chaos. Our experience is that, in dealing with creditors as entrenched in their positions as are the K.P., a trustee can accomplish little without replicating litigation such as that already pending outside (and, in this case, also inside) of bankruptcy. With all due respect to the Examiner's apparent belief that, with more teeth, a trustee could succeed where he himself failed, we find this to be wishful thinking. The great deference which the parties and this court properly paid to the Examiner gave him a very strong set of teeth. He simply could not perform the Herculean task of settling disputes which have developed a life unto themselves, apart from the events which initially caused them. Bankruptcy cannot solve every problem. No aspect of the Debtor's affairs has emerged which appears particularly susceptible to treatment under the Bankruptcy Code.

The factor most supportive of conversion is, in our view, the existence of substantial unencumbered assets in the Debtor's estate. However, there are few, if any, undisputed, unsecured creditors present who would benefit from a liquidation of these assets. At best, the presence of these assets would most benefit the Chapter 7 trustee appointed in the case and the trustee's professionals by assuring a source of funds for payment of administrative expenses. We see no reason to order such a pointless, expensive exercise just because the Debtor's estate is capable of financially bearing it.

■ We also note that we are heavily influenced by the fact that the USTE, who appoints and supervises the panel of interim trustees, one of which would at least initially be appointed upon conversion of this case to Chapter 7, has not only filed the Motion to Dismiss, but has vigorously supported that Motion to date. We conclude from the posture of the USTE that he believes that conversion would constitute a misuse of the time and talents of a trustee.

■ The remaining benefits of conversion identified by the K.P. would benefit only them, and perhaps Livesey, who is also caught up in the disputes between the K.P. and the Debtor. Such benefits, for the most part, are clearly obtainable in state court, possibly in the near future in light of the extraordinary interest recently shown by the CCP in resolving the matters filed in that court. No benefits or causes of action unique to bankruptcy cases have been identified. The mere fact that the Debtor has substantial unencumbered assets does not mean that liquidation under Chapter 7 is appropriate. Indeed, the Debtor's solvency (not taking into account the possible consequences of the CCP litigation), and the fact that he is currently paying his undisputed creditors on a current basis, further suggest that he does not belong in bankruptcy at all.

■ Finally, there are many cases which hold that dismissal is appropriate when the substance of the bankruptcy case is nothing other than a two party dispute. Indeed, many of these cases involve disputes between former partners or business owners not at all unlike the disputes between the K.P. and the Debtor. *See, e.g., SB Properties, supra,* 185 B.R. at 207 (disputes between former partners); and *Melp, supra,* 143 B.R. at 891 (disputes between partners and limited partners; in a statement reminiscent of the situation in this case, the court noted that the parties did not stipulate to the facts and that "based upon the contested nature of every procedure in this lengthy case, the Court believes there is little to which the parties would stipulate."). In the *Heritage Wood* case, *supra,* the court dismissed a debtor's Chapter 11 case in the presence of many of the factors which arose in the course of the instant case. 73 B.R. at 514. We find the following reasoning of that court sound:

In *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir.1984), the Court of Appeals declared that bankruptcy courts should become involved in cases only if the bank-

ruptcy court's services are needed to truly reorganize a debtor who is having financial problems; however, if the matter can be dealt with by another forum, better equipped to do it and in a better position to deal with a dispute between two parties or just a few parties, the bankruptcy court should refrain from exercising its jurisdiction.

In this particular instance, the Court finds that to allow this case to remain in this Court is simply an abuse of the reorganization process. This is basically no more than a two-party issue that can be resolved in the state court and perhaps in the federal district court on a RICO basis.

Although it may be argued that in *Albany Partners* the Court considered one plaintiff and one defendant, or two parties, the *Albany Partners* Court was actually viewing the matter more generally and referring to a dispute with two sides of the litigation which could best be dealt with in another forum.

Accordingly, the Court finds that the state court is much better able to deal with many of the issues and certainly the federal district court is better equipped to deal with a RICO action. . . .

The Court further finds that the Debtor lacks unsecured creditors. . . . With the exception of possible attorneys' fees, the Court finds no unsecured creditors; the Debtor has a group of secured creditors, who can look out for themselves in the nonbankruptcy court.

The Court further finds that a certain amount of forum shopping has occurred on behalf of the Debtor. The Debtor, for reasons best known to itself and perhaps the strategy of counsel, determined that it was not going to get the best side of the coin in the state court and looked to go elsewhere to have a new bite at the apple. . . .

It is, thereupon, Ordered and Adjudicated ... [that] the proceedings are hereby DISMISSED.

*Id.* We note that many two-party dispute cases are, like *Heritage Wood,* dismissed at the non-debtor party's insistence. However, the fact remains that such disputes do not belong in the bankruptcy courts regardless of who brings them there and who seeks to remove them.

3. *DESPITE THE CONSIDERABLE SUPPORT FOR A PERMANENT DISMISSAL OF THIS CASE, THIS COURT CHOOSES TO ONLY SUSPEND THESE PROCEEDINGS, PURSUANT TO 11 U.S.C. § 305(a), AT THIS JUNCTURE.*

Although, in applying the BICT, we can conclude rather easily that the weight of all of the factors recited at pages 414–417 *supra* falls on the side of dismissal, we are forced to acknowledge that an important factor is whether the state court system does provide a real alternative to the parties. The Debtor expresses great confidence that the recent extraordinary interest of CCP in resolving the disputes among the parties will, if allowed to proceed by elimination of the automatic stay arising when *Mazzocone II* vacated the Dismissal Order of June 2, 1994, succeed where the several years of litigation which preceded it were unsuccessful. The K.P. and Livesey are skeptical, and perhaps with good reason. They claim that, once the bankruptcy alternative is eliminated, the Debtor will revert to stall tactics which will frustrate even the CCP's best efforts. These counter-predictions may or may not prove accurate or be self-fulfilling prophecies. However, it is fairly certain to assume that it will be easier to predict their outcome if the CCP is allowed a certain time to proceed with the cases involving these parties before we render a final decision on dismissal. It is also not impossible that other events, unforeseen by the parties or this court at this time, may emerge in the next several months which will change the scenario of events as it now appears.

We therefore turn to 11 U.S.C. § 305 of the Bankruptcy Code, a section not referenced in any of the parties' briefings, to craft what we believe to be the fairest and best resolution of this controversy at this time. Pursuant to 11 U.S.C. § 305(a)(1), which provides as follows, we may exercise our discretion to temporarily relinquish jurisdiction over a case:

(a) The court, after notice and hearing, may dismiss a case . . . or may suspend all proceedings in a case . . . if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension. . . .

We recognize that we did not discuss the possible application of § 305(a)(1) with the parties prior to, during, or even subsequent to the remand hearing of April 26 and 27, let alone schedule a hearing to separately consider the possible application of § 305(a)(1). However, we believe that the hearing requirement of § 305 is satisfied by the April 26–27 hearing, of which all interested persons received notice and an opportunity to present evidence on the issues relevant to application of § 305(a)(1), even though this proceeding was not specifically designated a § 305 hearing. For example, in *Buffington v. First Service Corp.*, 672 F.2d 687, 690 (8th Cir.1982), the court held that, since the bankruptcy court had, before invoking § 305(a), conducted a hearing on a motion for relief from the automatic stay for which all interested persons received notice, coupled with the fact that the adequacy of the hearing was never challenged, the § 362(d) hearing fulfilled the requirements of a § 305 hearing. *Id.* Likewise, we conclude that the instant hearings on § 1112(b) fulfill the requirement for notice and hearing under § 305. Proper notice was given, parties appeared and relevant (?) testimony was taken. Moreover, with the further development of the facts at the hearing, the issues that would have been heard in a separate § 305 hearing have now been addressed. It would be neither necessary nor efficient to conduct another hearing specifically designated as a § 305 hearing when all the pertinent issues and arguments already have been thus considered.

Dismissal or suspension under § 305(a)(1) must be in the best interest of both the creditors and the Debtor, and the appropriateness of § 305 abstention is considered in light of several factors. *See In re Business Information Co., Inc.*, 81 B.R. 382, 387 (Bankr.W.D.Pa.1988), for a representative list of factors considered by most courts. In addition to the BICT, which we have already applied, a bankruptcy court, in applying § 305(a)(1), must consider the availability of another forum, the presence of state law issues, and whether or not litigation is currently pending in state court when deciding whether to abstain. *Id.* See also In re Owen-Johnson*, 115 B.R. 254, 257–58 (Bankr. S.D.Cal.1990); and *In re O'Neil Village Personal Care Corp.*, 88 B.R. 76, 80 (Bankr. W.D.Pa.1988), and cases cited therein.

Because a bankruptcy court is often not the proper forum in which to adjudicate non-bankruptcy issues, litigation of such issues is frequently best left to the state courts and should not be imposed upon this specialty court unless necessary to resolve a bankruptcy-centered dispute. Indeed, bankruptcy courts have resorted to § 305 when they have determined that they are not the proper forum to decide private management and partnership disputes. *See, e.g., In re ABQ–MCB Joint Venture*, 153 B.R. 338, 341 (Bankr.D.N.M.1993); and *In re Fax Station, Inc.*, 118 B.R. 176, 178 (Bankr.D.R.I.1990).

We believe that the facts of this case satisfy the factors enumerated in *Business Information, supra*, and we therefore conclude that abstention under § 305(a) is in the best interest of the K.P., other creditors, and the Debtor. It is clear that, if we were forced to decide between dismissal and conversion today, we would dismiss the case. In this light, it is difficult for the K.P. to take issue with any decision which does not result in immediate and final dismissal of this case. The Debtor, meanwhile, will be able to proceed in the CCP, which he deems a superior forum to resolve the parties' controversies, forthwith. Other creditors will benefit from the pressure put upon the two protagonists of the underlying disputes to effect a resolution in the CCP and, if this fails, to have the bankruptcy process as a further resort to the same end. There is no questioning the availability of a state forum, as evidenced by the fact that CCP proceedings have already been instituted and are ready to proceed with a renewed intensity. *See Monsour Medical, supra*, 154 B.R. at 207 ("Dismissal pursuant to section 305 is especially appropriate when another forum is available to determine the parties' interests and an action has been

commenced in that forum."). *Accord, O'Neil Village, supra,* 88 B.R. at 80; *Business Information, supra,* 81 B.R. at 387; and *In re Mineral Hill Corp.,* 16 B.R. 687, 688 (Bankr. D.Md.1982). Many of the protections sought by the K.P., as previously noted, are also available under state law. The Debtor clearly favors resolution of all of the underlying issues in the state court and believes it will be cheaper to litigate there. Finally, the time and resources of this specialty court should not be utilized by a case that no longer involves bankruptcy issues, unless absolutely necessary.

 In order to discourage delay or other abuses by the Debtor, or for that matter, any other party involved in the CCP litigation, however, we will only agree to suspend the bankruptcy proceedings for a finite period of time. After about six months, we will order the K.P. and the Debtor to provide us with a written status report, and thereafter require them and certain other interested parties to appear before us and provide us with a status report of the CCP litigation and any other pertinent developments. Depending on what we learn at that time, we may dismiss the case, convert it to a Chapter 7 case, or suspend it for another finite time period.

## D. *CONCLUSION*

An Order consistent with the foregoing conclusions will be entered.

## *ORDER*

AND NOW, this 2nd day of June, 1995, after hearings of April 26, 1995, and April 27, 1995, in accordance with the mandates of the District Court's Memoranda and Orders of February 21, 1995, March 6, 1995, and March 25, 1995, in C.A. Nos. 93–6231; 94–4198; and 94–5068 and 94–5201, respectively, remanding this court's Orders of June 2, 1994, and July 20, 1994, in this case to this court, it is hereby ORDERED AND DECREED as follows:

1. This court's Order of July 20, 1994, is REINSTATED in its entirety.

2. All other proceedings in this case are SUSPENDED pursuant to 11 U.S.C.

§ 305(a), pending the further status hearing in this case scheduled below. As a result, this case shall be considered and treated in all respects as if it were dismissed pending the status hearing referenced below.

3. All interested parties are accorded the opportunity to file and serve a written status report on developments relevant to this case between April 27, 1995, and the date that the report is due, on or before November 30, 1995. The Debtor and the Kates Parties are directed to file and serve such a report.

4. All interested parties, including the Debtor, the Kates Parties, Joseph Livesey, the United States Trustee, and the Examiner, are directed to review the status reports received and to attend a status conference in this case to consider any relevant developments occurring in the interim, on

WEDNESDAY, DECEMBER 6, 1995, at 9:30 A.M. to be held in Bankruptcy Courtroom No. 4 (Room 3620), Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. The original copy of the status reports referenced above shall be filed with the Clerk of this Court and copies sent to opposing counsel and delivered to the Court on or before 4:30 P.M. on November 30, 1995, at the following address:

The Honorable David A. Scholl

Chief Bankruptcy Judge

3118 United States Court House

601 Market Street

Philadelphia, PA 19106–1763